**In the Matter of the SPECIAL FEBRUARY 1975 GRAND JURY.**

**Appeal of Jose LOPEZ, Roberto Caldero and Pedro Archuleta.**

**Nos. 77–1885 and 77–1895.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1977.
Decided Sept. 22, 1977.

Michael E. Deutsch, Dennis Cunningham, Chicago, Ill., for appellants.

Thomas P. Sullivan, U. S. Atty., Robert T. McAllister, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before FAIRCHILD, Chief Judge, and SPRECHER and TONE, Circuit Judges.

FAIRCHILD, Chief Judge.

This is an appeal from orders entered by the district court finding Appellants Jose Lopez, Roberto Caldero and Pedro Archuleta[1] in civil contempt of court under the recalcitrant witness statute, Title 28 U.S.C. § 1826(a)[1a]. Appellants refused to take an oath before the grand jury or to submit handwriting exemplars, fingerprints, and photographs upon the grand jury's requests. Motions by the witnesses for bond pending appeal were denied by the district court as frivolous and taken for delay. 28 U.S.C. § 1826(b)[1b]. This court denied bail.

## I. *Background*

During the last two years the Special February 1975 Grand Jury has been investigating terrorist bombings in the Northern District of Illinois. The bombings have been claimed by or identified with a group calling itself the Fuerzas Armadas Liberacion Nacional Puertorriquena (FALN).

On November 3, 1976 Chicago police and FBI agents discovered a "bomb factory" in an apartment located in the Westown section of Chicago. This discovery along with fingerprint evidence obtained at the scene and subsequent laboratory tests provided the focus for the grand jury's investigation.

Appellants[2] were subpoenaed in connection with this investigation. For nine months they sought to quash the subpoenas on various legal grounds, including claims of unlawful electronic surveillance, under-representation of Latinos on the grand jury master list, infiltration of the defense camp and assertions that the FBI and the United States Attorney had usurped the grand jury's proper function. Numerous hearings were conducted by the district court into these allegations. All appellants' motions were finally denied and they were directed to appear before the grand jury.

On July 27 and August 17, 1977 appellants appeared before the grand jury and refused to take the oath or to submit handwriting exemplars, fingerprints, and photographs as requested. Immediately after

1. Pedro Archuleta participated with Lopez and Caldero on previous motions. He was also held in civil contempt pursuant to 28 U.S.C. § 1826(a). The notice of appeal in his case was filed separately and nine days after that of Lopez and Caldero but within the 60 day period provided under Federal Rule of Appellate Procedure 4(a). The government moved to dismiss for lateness, but we conclude that the time limits for appeals in civil cases are applicable.

1a. Title 28, United States Code, 1826(a) states:
(a) Whenever a witness in a proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of the—

(1) the court proceeding, or
(2) the term of the grand jury, including extensions,
before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

1b. Title 28, United States Code, 1826(b) provides:
(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such an appeal.

2. Other witnesses were subpoenaed as part of this investigation and complied voluntarily. Two witnesses, Moises Morales and Juan Lopez, were previously held in contempt. Later they purged themselves of contempt by complying with the grand jury's request for physical evidence.

their refusal, Archuleta, Lopez and Caldero appeared before the district judge and persisted in refusing to submit to identification procedures despite the court's direct order to do so. The district court committed appellants to the custody of the United States Marshal for the Northern District of Illinois until such time as they obey the court's order or for the duration of the Special Grand Jury pursuant to Title 28 U.S.C. § 1826(b). This appeal followed.

During the pendency of this appeal, on September 7, 1977, the grand jury returned a four count indictment charging Carlos Alberto Torres and Oscar Lopez,[3] with a variety of explosives violations and conspiracy with others unknown to destroy buildings in the name of FALN.

## II. *First Amendment Claim*

Appellants allege that the district court erred in refusing to allow them to show that the "dominant purpose" of the Special Grand Jury was political suppression of the Puerto Rican Independence Movement and an attempt to locate missing witnesses. Appellants claim that the primary reason for the subpoenas was appellants' exercise of First Amendment rights and that there was no valid connection between any legitimate subject matter of criminal investigation and information the grand jury could reasonably expect to obtain. Appellants view the subpoenas as part of "a massive program of illegal intrusion and unconstitutional invasion" including usurpation of the grand jury's role and subpoena power by the FBI.

Appellants proceed on the theory that the subpoenas and subsequent questioning pose a sufficiently serious interference with personal interests so that if done solely to suppress appellants' political beliefs, a violation of First Amendment rights would result. Assuming appellants' theory is correct without deciding its merits, we do not find appellants made their case. There is

evidence in the grand jury transcripts of legitimate reasons for the grand jury subpoenas.

Evidence in the record shows that the government stated in open court and in the pleadings that the purpose of the Special February 1975 Grand Jury was "to identify, locate, produce evidence against and charge the perpetrators of a string of bombings which to date have resulted in serious personal injury and extensive property damage."[4] The grand jury foreman filed an affidavit on behalf of the grand jury stating that the grand jury's sole concern was the "investigation of crimes involving the unlawful use of explosives" and "is . . . unconcerned with political beliefs, political activities and free speech."[5] Furthermore, the district judge on two occasions reviewed the impounded grand jury transcripts and photographic and documentary evidence adduced before the grand jury and found that the grand jury was appropriately seeking evidence pursuant to the subpoenas in question and the record was devoid of any indication that the grand jury was concerned with anything other than solving bombing incidents and saving lives. The district judge concluded there was not a sufficient basis justifying further hearings on this question. We have examined the grand jury transcripts and we agree.

Appellants contend that the district court erred in refusing to hold an evidentiary hearing beyond these two reviews of the grand jury record and exhibits. Appellants cite *United States v. McCarthy and Bar Mar Warehousing,* 514 F.2d 368 (3d Cir. 1975) in support of this proposition. At issue in *McCarthy* were well defined issues of fact as to the availability to the Internal Revenue Service Intelligence Division of a second inspection under 26 U.S.C. § 7605(b). The district court was said to err in that case by making a finding on the issues based on conjecture rather than evidence,

---

**3.** Oscar Lopez is the brother of Appellant Jose Lopez.

**4.** Government Brief p. 33; O.R. 7, 8, 51. See Tr. 12–1–76, p. 18, Tr. 8–17–77, p. 162.

**5.** O.R. 8.

and without first conducting an evidentiary hearing. In the present case, the district judge had the benefit of the ·government's representations, the grand jury foreman's affidavit and a review of the impounded transcripts.

 No issue can be taken with the proposition that grand juries must operate within the limits of the First Amendment, *Branzburg v. Hayes,* 408 U.S. 665 at 708, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and cannot be transformed by zealous prosecutors into symbols of oppression, *United States v. Dionisio,* 410 U.S. 1, 10, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). But the grand jury has a dual constitutionally mandated function— to determine if there is probable cause to believe a crime has been committed and to protect citizens against unfounded criminal prosecutions. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). A grand jury necessarily holds broad powers of inquiry into any conduct possibly violating federal criminal laws and can proceed without prior formal charge against a particular individual. *United States v. Bukowski,* 435 F.2d 1094, 1103, (7th Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1970). A grand jury may properly investigate on the basis of tips, ·rumors, hearsay, speculation or any other source of information and may inquire into the whereabouts of unlocated witnesses. *In re Stolar,* 397 F.Supp. 520, 522–23 (S.D.N. Y., 1975). A grand jury is not under a duty to disclose reasons for the information it seeks. It need not return an indictment; it has a legitimate interest in merely investigating a crime. *United States v. Reide,* 494 F.2d 644, 647 (2d Cir. 1974). The powers of a grand jury are broad but not limitless. A grand jury is under continuous supervision of a judge and a strong showing must be made before a court should interfere with its orderly process. *In re William H. Pflaumer and Sons, Inc.,* 53 F.R.D. 464 (D.C.Pa. 1971).

 Appellants failed to make a substantial showing that the motives of the government and the grand jury were improper. In our opinion a mere assertion is not enough to call for an evidentiary hearing and further inquiry. This court has reviewed the impounded transcripts of the Special February 1975 Grand Jury and we find a sufficient legitimate basis for the subpoenas. In addition, the subsequent indictment of Carlos Alberto Torres and Oscar Lopez, alleging that there are other unknown conspirators, issued on September 7, 1977 is evidence of a continuing investigation of bombing-related activity within the authority and the legitimate function of the grand jury. The district court did not err in denying further evidentiary hearing on this issue.

III. *Failure of District Court to Require Disclosure of Informants*

 Appellants allege that the district court erred in not requiring the government to disclose whether informants or agents had infiltrated the "legal camp" of appellants. Appellants base their claim upon the activity of a Chicago attorney, Ward Fisher, and their theory must be that the decision to subpoena appellants or the content of questions ultimately to be asked was based on information obtained in violation of protected privacy or privilege.

At the time the so-called bomb factory was discovered in Carlos Torres' building on November 3, 1976, Fisher was representing Torres' parents in an unrelated civil matter. Fisher was present when the FBI interviewed the parents about the whereabouts of their son, Carlos. Later Fisher attended a meeting with appellants' lawyers presumably to discuss legal strategy for the witnesses who were under subpoena. Some time later, in a conversation with one of the witnesses' lawyers about a civil case, Fisher stated ". . . I have to go out of the office now and help the FBI pick up the Puerto Rican bomber.[6]" On the basis of these circumstances, and comment by Fisher, appellants conclude he was an infiltrator in the defense camp whose purpose was to supply the government information regarding legal strategy and tactics.

We do not regard these facts as an adequate basis for compelling the government

6. O.R. 24.

to disclose its exact relationship with Fisher, the facts, if any, gained from him, or disclosure of other persons who might be considered "informants" in connection with this investigation.

The test would be whether there is reason to believe that Fisher supplied information, relevant to the decision to subpoena appellants or suggesting areas of inquiry of them, gained under such circumstances that its acquisition by the government would constitute an invasion by the government of legally or constitutionally protected privacy of appellants. Doubtless appellants are not in a position to demonstrate the content of any relevation by Fisher to the government, but we think it is fair to require them at least to present reasons of some substance to believe that such invasion has occurred.

Appellants presented no sufficient evidence concerning Fisher's role as an informer in support of the disclosure motion. We find the district court did not err in dismissing the motion.

### IV. *Challenge to the Grand Jury Composition*

Appellants allege the district court erred in finding that appellants failed to make out a *prima facie* case of unlawful discrimination against Puerto Ricans and other Latinos in selection for jury service in the Northern District of Illinois. Appellants object to the use of the 1970 Census and the Spanish Name Book [7] as basis for determining the extent of under-representation of Latinos.

If appellants were indicted, they would clearly have standing to attempt to show systematic exclusion of members of their ethnic groups from the grand jury. If successful, they would be entitled to dismissal. *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Here appellants assert the right to challenge on a similar basis the action of a grand jury in subpoenaing them. We doubt that the use of the subpoena power is an injury of suffi-

cient substance so that the person subpoenaed has the right to challenge the composition of the grand jury, claiming a denial of equal protection in that members of their ethnic group were systematically excluded.

Be that as it may, however, we conclude that appellants have not succeeded here in showing a *prima facie* case, so as to compel the government to come forward with justification for any disproportion.

The affidavit of H. Stuart Cunningham, Clerk of the District Court, describes the process of jury selection, starting with a random selection from lists of registered voters. His examination of the records of those called for jury service from April 1976 through September 1976 showed that 1449 individuals were called. Of them, 50, or 3.5 per cent have Spanish surnames. During the same period, 173 persons were selected to serve on grand juries. Of those, 6, or 3.5 per cent had Spanish surnames. Census data for 1970 indicate that persons of Spanish language made up 3.76 per cent of the population of the Eastern Division of the Northern District, aged 18 or over. The only conflicting information was an affidavit of Candace Wayne, presented by appellants. Affiant examined the same lists, but identified only half as many Spanish surnames.

Appellants presented testimony indicating that the number of Hispanic people in the present population of the division exceeds the figure given in the 1970 census. We think, however, that their showings fell far short of establishing a *prima facie* case of invidious under-representation. Surely they did not approach the showings deemed *prima facie* in *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

### V. *Claim that Subpoenas were Issued Because of Information Obtained by Unlawful Wiretapping*

Appellants contend that the subpoenas cannot be enforced because they be-

---

**7.** Immigration and Naturalization Service of the United States Department of Justice prepares the Spanish Name Book. (Publication

M–156, Rev. 1973). It contains all names commonly associated with persons of Latin or Spanish heritage.

lieve that the desire to question them and obtain further identification of appellants was triggered by information obtained by unlawful wiretapping. They rely on 18 U.S.C. § 2515, as interpreted by *Gelbard v. U. S.*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972).

*Gelbard* held that a showing that "interrogation" by a grand jury would be based upon the illegal interception of the witness' communications is a defense to a finding of contempt for refusal to answer questions. Appellants proceed upon the assumption that refusal to be sworn at all and refusal to submit to identification procedures would also be entitled to the protection of *Gelbard* if the selection of appellants as witnesses were shown to be motivated by information obtained from illegal interception. We shall also so assume.

Appellants asserted their claim, but the district court accepted, as a sufficient answer, affidavits of Assistant U. S. Attorneys in charge of the proceeding and the FBI case agent[8] that affiants had no personal knowledge of any electronic surveillance being conducted against the witnesses, and that to affiants' knowledge their information was the result of interview, record checks and evidence obtained at the bomb factory site. Persons in the positions of affiants are very likely to know whether any of their information results from wiretaps, but obviously they are not in a position to deny categorically any and all such actions by government.

Appellants' position is that the district court should have ordered that the government make a search of such proportions that affidavits unequivocally stating that no wiretapping had occurred could be filed.[9]

8. Subsequent to the oral arguments, on September 14, 1977 the government filed a motion pursuant to Rule 10(e) F.R.A.P. to supplement the record with additional detail concerning the basis for their denial of electronic surveillance. U. S. Attorneys Margolis and McAllister filed identical affidavits stating that (1) they were unaware of any electronic surveillance of Appellants Lopez, Caldero and Archuleta; (2) they were unaware of any information having been obtained by the FBI or any other agency through electronic surveillance of witnesses' attorneys Deutsch, Cunningham, Clark or law graduate Siegel; (3) to their knowledge, all information in the possession of the government concerning Lopez, Caldero and Archuleta was obtained by record checks, interviews and physical evidence recovered from the bomb factory; (4) no questions were asked of appellants by the grand jury because of their refusal to take an oath to tell the truth; (5) questions which would be asked if appellants agreed to appear before the grand jury are based on fingerprints and documents recovered inside the bomb factory; and, (6) all information obtained by them during this investigation was provided by other witnesses or Agent Deans of the FBI.

Special Agent Deans of the FBI stated in his additional affidavit that: (1) he is the agent who is solely responsible for the FBI investigation of the bombing incidents; (2) he is unaware of any information having been obtained by the FBI or any other agency in connection with this investigation by either legal or illegal wiretaps; and (3) he is unaware of any information having been obtained by the FBI or any other agency through electronic surveillance of the witnesses' attorneys or law graduate Siegel.

FBI Special Agent William Dyson, Jr. filed an affidavit stating that: (1) as a result of a request by the Department of Justice he reviewed electronic surveillance records of the Chicago office of the FBI and (2) during the period from November 1976 to the present no record of electronic surveillance could be located on phone lines subscribed to or used by Attorneys Deutsch, Cunningham, Clark, law graduate Siegel, and Appellants Lopez, Caldero, and Archuleta.

Appellants filed an answer opposing the motion on the grounds that (1) permitting the inclusion of additional affidavits at the appellate stage will deprive appellants of adversary inquiry into the content of the affidavits; (2) the government's additional affidavits are equivalent to an admission, or confession of error, and that an order requiring attorneys' search and adversary proof would be appropriate; and (3) the affidavits sought to be introduced by the government are still insufficient, and do not properly deny the existence of wiretapping as to appellants and their attorneys.

While we acknowledge the government's motion and appellants' response, we do not find a ruling on this motion necessary to the outcome of this appeal.

9. Appellants also cite *In re Evans*, 146 U.S.App. D.C. 310, 452 F.2d 1239 (1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972) for the proposition that an unsupported claim is sufficient to require the government to affirm or deny the existence of electronic surveillance. In *Evans*, however, the contempt convictions were not allowed to stand because the district court summarily dismissed witness-

We consider the affidavits filed to be an adequate response to a bare claim that the subpoena must have been triggered by information obtained by unlawful wiretapping. The question here is whether appellants made a showing of the probability of wiretapping of sufficient substance that a wide search and unequivocal denial could fairly be required.

The pertinent record is confusing and speculative. On December 22, 1976 appellants filed their first motion, with affidavits asserting that appellants experienced occasional clicks, echoes, and beeps on their telephone lines. The government then filed the affidavits deemed sufficient by the district court.

In ruling February 23, 1977, the court concluded ". . . [I]t would be an extreme position . . . to hold a bald assertion based on unsupported suspicions sufficient to compel an exhaustive search of governmental agencies. . . ."[10] The judge denied appellants' motion without prejudice stating that he would reconsider the matter if appellants could produce some evidence of "technical sophistication."[11] In reaching this result, the judge relied upon

es' claim that the questions were the fruit of an unlawful wiretap without requiring government affirmance or denial of such activity. *Evans* is factually distinguishable from the present case. Here, the district court did not summarily dismiss the appellants' claim of illegal wiretapping but held an evidentiary hearing into the allegations and required affidavits from government officials involved in the investigation. In short, the district court provided appellants with procedural protections envisioned by 18 U.S.C. § 3504(a)(1). In addition, the "mere assertion" of illegal wiretap statement by the *Evans* court has been recently rejected by the same circuit in which it originated. *In re Millow*, 529 F.2d 770 (2d Cir. 1976). The court in *Millow* stated "The majority opinion in *In re Evans* insofar as it allows a witness to rely on 'mere assertion' seems to us unsound." *Millow*, 529 F.2d at 775.

Appellants rely on *U. S. v. Alter*, 482 F.2d 1016 (9th Cir. 1973), for the proposition that "an affidavit by a witness claiming illegal wiretapping was a sufficient prima facie showing and functioned to shift the burden to the government to 'squarely affirm or deny these charges'." (Appellants' Brief 15.) Appellants are mistaken in their interpretation of *Alter*. *Alter* does not stand for the proposition that any affidavit by a witness claiming electronic surveillance of counsel will operate to shift the burden to the government. The court in *Alter* identified five specific categories of information the affidavit must reveal in order to raise a *prima facie* issue of electronic surveillance. The witnesses' affidavit must include (1) specific facts that reasonably lead the affiant to believe that named counsel for the named witness was wiretapped; (2) date of such suspected surveillance; (3) outside dates of representation of the witness by the lawyer during the period of surveillance; (4) identity of persons, by name or description, with phone numbers, with whom the attorney was communicating at the time of the suspected surveillance; and, (5) facts showing some connection between possible electronic surveillance and the grand jury

witness who asserts the claim or the grand jury proceeding in which the witness is involved. While the *Alter* court recognized that the witness does not have to plead and prove his entire case to establish standing to trigger the government's responsibility to affirm or deny, a showing must be made that "[a] good cause exists to believe that the witness' counsel was subjected by someone to illegal surveillance in connection with the grand jury proceeding." *U. S. v. Alter, supra*, at 1026. In *Alter*, the court found that because the affiant made a sufficiently concrete and specific showing of interference with phone calls and possible FBI involvement, the burden was shifted to the government squarely to affirm or deny. In that case the U. S. Attorney's affidavit was held inadequate because it was conclusory and did not respond to the specific allegations raised in the witnesses' affidavit.

The present case can be distinguished from *Alter* on the grounds that appellants did not make a concrete and specific showing of probable electronic surveillance. Consequently, the affidavits of the U. S. Attorney and the FBI Special Agent were found to be inadequate response to appellants' allegations.

Appellants cite language in *Korman v. U. S.*, 486 F.2d 926 (7th Cir. 1973) for the proposition that a formal and binding denial of wiretapping is necessary, given the recent history of government "indiscretions." The relevant *Korman* holding, however, was that the denial must be in affidavit rather than letter form, *i. e.*,

> ". . . an official governmental denial of electronic surveillance must at the very least be submitted in the form of an affidavit by a responsible government official."

The answers here were in affidavit form by those with knowledge of the immediate circumstances of the grand jury investigation.

10. Tr. 2–23–77 at 8.

11. *Id.* at 11.

decisions which state that a search of agency files is not required where movants' claim lacks any real evidentiary basis.[12]

Almost six months later, appellants produced evidence of suspicious wires discovered on the telephone pole located outside the residence of Appellant Lopez and his counsel, Mr. Deutsch. Allegedly these wires had been discovered only ten days after the February ruling. They had been examined by a telephone company employee who stated he was fearful of disclosing his identity, but executed an affidavit as John Doe. We see no very persuasive explanation for the long delay if the wires had been discovered at the time alleged.

On August 17, 1977 an evidentiary hearing on the wiretap issue was held. Appellants presented an expert witness, James Thomas, who examined photographs of the ready access site located on the telephone pole which provides service to the Lopez-Deutsch residence. Thomas viewed appellants' photograph number 3 taken on July 23, 1977 and identified a possible splice in the cable and some possibly extraneous wires. Thomas testified that there appeared to be tampering with the wires which could mean that a wiretap had been placed. On the photograph there was no evidence of extraneous equipment attached. Thomas also inspected photographs taken on August 13, 1977 and pointed out nicks and scars on the cable concluding that someone had "come along and cleaned . . . up, made the repairs, so that normal service would continue."[13]

The government objected to appellants' use of Thomas as an expert because of his limited experience with wiretaps and because he had not actually examined the telephone connections in question. In response to Thomas' testimony the government called Frank Gewalt, an employee of Illinois Bell Telephone Company who had undertaken many wiretap inspections for the company. Gewalt personally examined the ready access site near the Lopez-Deutsch residence on July 28, 1977. He observed that the equipment was in proper working order and "found no unique device or foreign connections." Gewalt testified that when he opened the terminal box, it contained cobwebs and was quite dirty indicating no one had disturbed it for quite a while. Gewalt ran various tests and determined there was no interference with telephone service.

Gewalt also examined the diagrams and pictures submitted with the "John Doe" affidavit. He identified the extra wires as part of the Bell system. Gewalt also noted that there were errors in the diagram presented in the "John Doe" affidavit; the diagram did not accurately reflect the wiring scheme at the ready access site. Gewalt also examined the pictures Thomas had viewed and marked. He called attention to the fact that although appellants' photograph 10 showed a wire supposedly cut to allow for a wiretap, that wire did not lead to the Lopez-Deutsch residence. Thus, even assuming the appellants' photographs accurately portrayed the equipment, there was no evidence that the Lopez-Deutsch line was tapped.

On cross-examination of Gewalt, appellants' attorneys pointed out that apparently between the time appellants' first set of photographs was taken on July 23, 1977 and the last set on August 13, 1977, the ready access site cover had been removed and reversed. In the first set of photographs the "odd" designation stamped on the side of the cover was visible; in the second, the "even" designation was visible. Gewalt testified that when he examined the terminal on July 28, 1977 the cover was not removed and reversed, but was pushed to one side along the cable. Appellants infer on the basis of the reversed cover that some third party, presumably in the course of disman-

---

**12.** *In re Millow*, 529 F.2d 770 (2d Cir. 1976); *U. S. v. Grusse*, 515 F.2d 157 (2d Cir. 1975); *In re Vigil*, 524 F.2d 209 (10th Cir. 1976); *U. S. v. Alter*, 482 F.2d 1016 (9th Cir. 1973); *Korman v. U. S.*, 486 F.2d 926 (7th Cir. 1973).

**13.** Tr. 8–17–77 at 29.

tling the wiretap, had removed and reversed the cover. Thus, they contend that because they conclude the only possible purpose for such reversal is an unauthorized wiretap, the district court should have forced further search and report from the government.

The district court expressed the opinion that the exhibits were speculative in nature. We agree. In our view the record, including the photographs, falls far short of a showing of any substance that wiretapping had probably taken place.

The grand jury transcripts show information which would make it a reasonable decision to subpoena appellants in connection with the legitimate investigation. This information is of a nature which could scarcely have been located as a result of wiretapping. Its presence renders it even more improbable that information obtained by wiretapping motivated the subpoenas.

Under the circumstances we conclude that there was no basis for requiring a general search of all investigative agencies nor a more nearly unequivocal assertion that no wiretapping had in fact occurred.

The affidavits originally filed by the government did not speak to the possibility of wiretapping of appellants' counsel. Appellants had made bare assertions of surveillance of counsel. The only attempt to show a basis therefore was the showing attempted concerning the telephone which Appellant Lopez shared with his counsel, Deutsch. Under the circumstances we do not find the denials in the original government affidavits insufficient on that account.

The judgments appealed from are AFFIRMED.