In re NOVEMBER 1979 GRAND JURY.

VELSICOL CHEMICAL CORPORATION et al., Petitioners-Appellants,

v.

UNITED STATES of America, Respondent-Appellee.

Nos. 79–2480, 79–2507.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1980.

Decided March 11, 1980.

Rehearing and Rehearing En Banc Denied April 24, 1980.

Robert L. Weinberg, Williams & Connolly, Washington, D. C., for petitioners-appellants.

Peter G. Beeson, Dept. of Justice, Washington, D. C., for respondent-appellee.

Before CUMMINGS, SPRECHER and WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

In this consolidated appeal, appellants are seeking to reverse two orders of Chief Judge Parsons denying motions related to a grand jury investigation into certain activities of Velsicol Chemical Corporation. In the first order, Judge Parsons refused to terminate the grand jury investigation or to conduct an evidentiary hearing into alleged continuing misconduct by Government prosecutors. In the second, he denied Velsicol's motion to quash subpoenas *ad testificandum* issued by the grand jury on November 9, 1979. These subpoenas sought the appearance of Robert L. Ackerly and Charles A. O'Connor, III, members of Sellers, Conner & Cuneo, a Washington, D. C., law firm that formerly served as outside counsel to Velsicol. We affirm with respect to both orders of the district court.

In the early 1970's the United States Environmental Protection Agency (EPA) was investigating whether two chemicals, heptachlor and chlordane, then manufactured exclusively by Velsicol Chemical Corporation, produced tumors and cancer in laboratory animals. Suspecting that Velsicol and certain of its officers, employees and attorneys may have withheld information from the EPA on carcinogenicity studies conducted at Velsicol's behest by outside laboratories, the EPA referred information to the Justice Department, which began investigating the matter with the aid of a grand jury. This Court first had contact with the case during these initial proceedings. Because part of the investigation involved questions about the legal representation of Velsicol during relevant periods, subpoenas were issued to three members of the Sellers firm. Subsequently, Robert L. Ackerly refused to answer certain questions before the grand jury, arguing that the attorney-client privilege and the work product rule precluded disclosure of communications between Velsicol and its outside counsel. We ultimately affirmed a district court order to compel the testimony, finding that Velsicol had waived the privilege through the testimony of Neil Mitchell, Velsicol's General Counsel, about conversations with the Sellers firm. We also held that the testimony was not barred by the work product rule. *Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671 (7 Cir. 1978), certiorari denied, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538.

The present appeal stems from extraordinary facts that came to light once the 1976 grand jury finished its deliberations. That grand jury returned an indictment in December 1977 against Velsicol and six individuals charging them with making false statements to a government agency, conspiracy to make those statements, and violations of the mail fraud statute. The defendants named in the indictment countered by filing various motions charging numerous instances of grand jury abuse by the prosecutors. After an evidentiary hearing, Judge Leighton found that there had been prosecutorial misconduct before the grand jury and, in an unusual decision,[1] ordered dismissal of the indictment. *United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill. 1979). Judge Leighton's opinion in *Gold* focused on the activities of Bingham Kennedy, an EPA official who served as one of the prosecutors before the 1976 grand jury while linked to the agency's consideration of the Velsicol matter. In addition to a conflict of interest, Judge Leighton found that Kennedy's misconduct included improper comments on the exercise of constitutional rights, the withholding of exculpatory evidence, the unauthorized disclosure of grand jury material, the destruction of potentially relevant evidence, procedural irregularities, and improper testimony as a witness before the grand jury.

A week after the dismissal, the Government filed a motion seeking clarification whether the dismissal of the indictment was with or without prejudice. This motion prompted the defendants to request a ruling that the dismissal was with prejudice, arguing that such a ruling would deter future governmental misconduct and serve to acknowledge the "irremediable injury" caused defendants by the passage of time and such acts of misconduct as the destruction of evidence. On July 20, 1979, Judge

Leighton held that the prior dismissal needed no further clarification. He explained that he chose not to rule further on the dismissal because the decision whether to present the case to another grand jury properly belonged to the Department of Justice. The Government thereafter appealed the *Gold* decision, but later elected to seek a voluntary dismissal of that appeal.[2] On September 18, 1979, it notified defendants of its decision to re-present the evidence to a new grand jury.

On September 28, 1979, Velsicol filed a motion again requesting Judge Leighton to dismiss the original indictment with prejudice. After entertaining argument on the question, Judge Leighton denied this motion on October 24, 1979, reiterating his view that the judiciary should not interfere with "the discretion vested in the executive branch of the government whether to prosecute, not prosecute, or to abandon a prosecution already started" (Supp. App. Item 3, p. 3). Because this ruling also repeated a statement by the Government that Bingham Kennedy "is no longer assigned to this investigation," the Government wrote to Judge Leighton on October 31 to report that Kennedy had in fact traveled to Chicago twice in October to explain to the current prosecutors the organization and contents of the files assembled in the "Velsicol Room" of the United States Attorney's office during the previous investigation. In an early November response to the Government's letter, appellants again requested dismissal with prejudice, this time citing the lack of candor on the part of the Government regarding Kennedy's role. Judge Leighton took no action in response to these communications.

In the meantime, the Government selected a new team of counsel to handle the re-presentation of the case and adopted

---

1. A panel of the Sixth Circuit ordered the termination of a grand jury investigation for similar reasons in *In re April 1977 Grand Jury Subpoenas—General Motors Corp.*, 573 F.2d 936 (6th Cir. 1978). The case was subsequently heard *en banc*, and the Sixth Circuit held that the district court's order refusing to terminate the proceedings was not appealable. 584

F.2d 1366 (6th Cir. 1978) (*en banc*), certiorari denied, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492.

2. We granted the Government's motion to dismiss the appeal on September 20, 1979, in *United States v. Gold*, No. 79–1944.

elaborate procedures to avoid any repetition of the previous grand jury abuse. On November 5, 1979, another grand jury was empaneled to renew the investigation of Velsicol and those previously indicted with it. Responding to a Government request to transfer the evidence before the 1976 grand jury to the new prosecutors, Judge Parsons ruled on November 19, 1979, that the documents produced before the earlier grand jury should remain in the Government's possession but that the prosecutors must serve subpoenas on the persons to whom the documents belonged so that they might have an opportunity to be heard in opposition to any use of the material. The new grand jury had already issued subpoenas for the testimony and documents in the possession of Robert Ackerly and Charles O'Connor, and Velsicol moved to quash these subpoenas on November 21. At the same time, having previously brought the matter of Kennedy's Chicago trips to Judge Parsons' attention, Velsicol now requested an evidentiary hearing on Kennedy's involvement in the new grand jury proceedings. Eight days later Velsicol formally moved to terminate the grand jury proceedings.

On December 6, Judge Parsons denied each of the Velsicol motions. Regarding the subpoenas, he held that "Velsicol's waiver of its attorney-client privilege during the previous grand jury proceedings remains operative for this one" (App. 14a). As for the motion for grand jury termination and an evidentiary hearing, Judge Parsons acknowledged that former prosecutor Kennedy had twice visited Chicago to explain to the new prosecutors the contents of the "Velsicol Room" in the United States Attorney's office despite the representations that he was no longer assigned to the case. But after considering eight affidavits filed by the Government and three opposing affidavits, the judge concluded

"that Mr. Kennedy's two visits to Chicago were made for the limited purpose of facilitating the transition between the group of attorneys which presented the documents to the first grand jury and those who are endeavoring to present them to the present grand jury sitting in this jurisdiction now. The visits were of a housekeeping nature, intended to enable the new prosecution team to make some sense out of the voluminous mass of documents it had inherited." (App. 7a–8a.)

Consequently, appellants' motion to terminate the present grand jury investigation as well as the request of an evidentiary hearing was denied. Appeals were then taken from both orders.[3]

*Jurisdiction of This Court*

■ In response to an inquiry of this Court, the Government argued initially that the instant appeals are from non-final orders and should be dismissed for lack of jurisdiction. Although as a general matter appeals from orders regarding ongoing grand jury proceedings are not favored (*In re Special March 1974 Grand Jury—Ingram Corp.*, 541 F.2d 166, 168–169 (7th Cir. 1976), certiorari denied, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773), the Supreme Court has adopted a flexible view of finality that takes account of exceptional circumstances. See *Matter of Special April 1977 Grand Jury—Appeal of William J. Scott*, 587 F.2d 889, 891 (7th Cir. 1978). This case falls within the exceptional category. Given the dismissal of the first indictment under highly unusual circumstances, this appeal is unlike the ordinary case in which a party seeks review of an initial decision whether to terminate grand jury proceedings or hold an evidentiary hearing. See *e. g., In re Special March 1974 Grand Jury, supra*; *In re April 1977 Grand Jury Subpoenas—General Motors Corp.*, 584 F.2d 1366 (6th Cir.

---

**3.** In an order issued December 13, 1979, modified on December 17, we granted a stay pending appeal and established an expedited schedule for briefing and argument. The appeals were consolidated by order of this Court dated December 19, 1979. At the request of the Government, we accelerated the resolution of this appeal insofar as feasible after the Government admitted it could not possibly meet its earliest target date (January 20, 1980) for seeking another indictment.

1978) (*en banc*), certiorari denied, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492. Appealability now is warranted because Velsicol's arguments raise the prospect of a virtually unique kind of injury arguably not remediable by a future review.

■ As for review of the subpoenas, we rejected appealability objections similar to those now proffered by the Government in disposing of the 1977 appeal regarding the original subpoenas of members of the Sellers firm. We there concluded in language applicable here:

"At this juncture it is clear Velsicol cannot protect its rights in the absence of an appeal. Velsicol had standing to intervene and this is a situation properly covered by the *Perlman* exception. We have jurisdiction to entertain the appeal under 28 U.S.C. § 1291." 561 F.2d at 674.

The "*Perlman* exception," which is based on *Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950, provides for appellate review when persons subpoenaed to testify about potentially privileged matters do not themselves hold the privilege and might be disinclined to risk a contempt citation to protect the information. Intervention and appellate review provide those holding the privilege some means of preserving confidential matters. Recent decisions have supported the continuing viability of this exception. See *In re Grand Jury Investigation of Ocean Transportation*, 196 U.S.App.D.C. 8, 9, 604 F.2d 672, 673 (D.C. Cir.1979), certiorari denied, —— U.S. ——, 100 S.Ct. 229, 62 L.Ed.2d 169; *In re Grand Jury Proceedings—Appeal of FMC Corp.*, 604 F.2d 798, 800–801 (3d Cir. 1979); *Matter of Special April 1977 Grand Jury—Appeal of William J. Scott, supra* at 891–892. To the extent that *In re Oberkoetter*, 612 F.2d 15 (1st Cir. 1980), application for stay denied by Supreme Court, —— U.S. ——, 100 S.Ct. 726, 62 L.Ed.2d 727, is to the contrary, we decline to follow it.

*Termination of Present Grand Jury Proceedings*

The most immediate reason for appellants' motion to terminate was the Government's decision to have former prosecutor Kennedy, whose misconduct was chiefly responsible for the dismissal of the first indictment, visit Chicago twice in October 1979 to meet with the new prosecutors. Although appellants assert these visits violated the spirit of Government representations that Kennedy is no longer assigned to the investigation, the various affidavits submitted by the parties with respect to the motion to terminate satisfy us that Kennedy's visits were simply to introduce the new prosecutors to the system of filing the documents garnered during the prior investigation and maintained in the "Velsicol Room." As such, the visits were not inconsistent with the Government's representations and Judge Leighton's October 24 order. Indeed, since Judge Leighton declined the opportunity to amend his opinion in response to the Government's October 31 letter and Velsicol's opposing memorandum, he presumably discerned no violation of his previous order.

Since the *Gold* opinion concentrated on Kennedy's actual activities before the grand jury, it is in fact difficult to see how the October 1979 "housekeeping" consultations contravene the thrust of that decision. Nevertheless, appellants have sought to expand *Gold* from a decision condemning specific acts of prosecutorial misconduct before the first grand jury into a decision suggesting a general taint among all the work product and evidence adduced during that investigation. This approach represents a mischaracterization of *Gold* as evidenced by the dearth of any references to the evidence and work product issue in any of the documents and rulings surrounding Judge Leighton's consideration whether the grand jury dismissal should be with prejudice. Even appellants made scant reference to any question of taint in their various memoranda, including their April 27 memorandum opposing the Government's motion to characterize the dismissal as without prejudice, their May 16 response to the Government's memorandum in support of that motion, their September 28 motion for dismissal with prejudice, their October 17 reply to the Government's opposition motion and even their early November memorandum

regarding the visits of Kennedy. To be sure, in their April 27 response to the Government's clarification motion, appellants stated

"[T]he governmental improprieties in this case have incurably infected virtually every aspect of the prosecution. Kennedy's illegal participation touched and tainted much, if not probably most, of the evidence gathered by the government and has created a situation in which the full scope of its prejudicial effects can never be accurately determined." (at pp. 11–12).

But not only did appellants not repeat this argument, which appeared as part of its argument that the totality of the circumstances warranted a dismissal with prejudice, in their May 16 response to the Government's memorandum in support of its clarification motion, but Judge Leighton made no mention of the above-quoted argument and presumably rejected it in his July 20 order. In view of his failure to amend the *Gold* opinion or to touch upon this subject in his subsequent orders, it follows that Judge Leighton was not concerned about future Government use of the earlier work product and evidence.

It should also be noted that one of the current prosecutors, Jeffrey Kent, has with the knowledge of Judges Leighton and Parsons and without protest from the appellants continued to participate in the Velsicol investigation commencing six months after the return of the first indictment and ten months before the *Gold* opinion. It would make no sense of course to allow Kent to participate in the current investigation if Judge Leighton had meant the work product of the first investigation to be isolated from the second. In essence, the primary ground for the *Gold* decision was that there was "an unauthorized person [Bingham Kennedy] in the grand jury room." 470 F.Supp. at 1338. In short, a review of all relevant factors confirms that the heart of *Gold* was a concern that a biased and errant prosecutor had improperly manipulated the grand jury investigation in order to reach a predetermined result rather than that the evidence accumulated by the Government was itself irretrievably tainted.

■ Accordingly, *Gold* does not require a termination of the grand jury investigation because of the present prosecutors' contact with Kennedy or the evidence he accumulated. In Judge Parsons' phrase, the *Gold* opinion directs not that "there should be miles of distance between Mr. Kennedy and the government's attorneys * * * [but] that there be miles between Mr. Kennedy and the new grand jury" (App. 10a). In any event, Judge Parsons' order of November 19 (App. 1) ensures that appellants will be fully protected from prejudice by requiring the current prosecutors to serve subpoenas on the parties to whom the various documents in the Government's possession belong, so that they may have an opportunity to be heard in court before the documents are submitted to the 1979 grand jury. The proper course for the Government charted by Judge Parsons (App. 9a–11a) is to present this evidence in a fair and impartial manner so that the 1979 grand jury can perform its appropriate function in deciding whether to bring an indictment. As the Government has noted (Br. 43, 46, n. 16), access to the previously assembled materials will in fact aid this process by allowing the present prosecutors to identify more easily *Brady* and Jencks Act material. The elaborate procedures adopted by the Government since *Gold*, and Judge Parsons' supervision of the Government's actual conduct before the grand jury will also ensure the fairness of the new proceedings. As part of his supervision, Judge Parsons will no doubt enforce the following representation of the Government:

"The subjects of this investigation may expect that in this on-going re-presentation no prosecutor will testify; no prosecutor with a conflict of interest will appear before the grand jury; exculpatory evidence will be tendered along with the incriminating; and witnesses will be interrogated in a thorough and proper fashion" (Br. 42).

Moreover, if the new prosecutors overstep their role, any irregularities can, as Judge Parsons noted, "best be determined [by ap-

pellants and the trial court] after the indictment when the transcripts of what went on before the grand jury can be reviewed" (App. 10a).

Not only is there no evidence that Kennedy's actual performance before the initial grand jury will affect the development of the Government's theory of the case, but the new prosecutors will surely be able to evaluate the merits of the present investigation without being blinded by any theories and working materials developed in the first investigation. In this regard, appellants will be further protected by the district court's "directive that the attorneys for the government now presenting the matter before this grand jury have from henceforth no further contact whatsoever" with Kennedy without leave of court (App. 11a), thereby precluding any direct influence by Kennedy on the re-presentation. Finally, it is unnecessary to apply the exclusionary rule to prevent the Government from reaping any benefit from past misconduct. The record attests that the dismissal of the first indictment has provided a sufficient deterrent against a repetition of misconduct of the sort that previously characterized this case.

■ Judge Parsons' determination that an evidentiary hearing was not needed with respect to the motion to terminate the present grand jury investigation was also permissible. As noted, this record does not contain any showing that *Gold* has been violated. As for Kennedy's trips to Chicago, the Government's eight affidavits are sufficient to dispose of any question of wrongdoing, especially given the presumption of regularity accorded the acts of public officials in grand jury matters. *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972). Nor is there any basis for discarding this presumption here, as appellants urge, by imputing Kennedy's improprieties in the earlier proceedings to the new team of prosecutors. In effect, as in *Matter of Special February 1975 Grand Jury—Appeal of Lopez*, 565 F.2d 407 (7th Cir. 1977), appellants have failed to make a substantial showing that the motives of the present Government

prosecutors are improper. See also *Matter of the Special April 1977 Grand Jury—Appeal of William J. Scott, supra* at 892. Appellants' "mere assertion [to the contrary] is not enough to call for an evidentiary hearing and further inquiry" (565 F.2d at 411) since, as Judge Parsons noted, a requirement of an evidentiary hearing on such a record would mean that "the government would never be able to present a matter to a grand jury without challenges being made to the propriety of the conduct of the government's attorneys" (App. 9a). In short, on this record, the district court did not act improperly in refusing to grant an evidentiary hearing.

*Waiver of the Attorney-Client Privilege*

In the prior appeal, we held that Velsicol had waived the attorney-client privilege with respect to members of the Sellers firm because Velsicol's General Counsel, Neil Mitchell, waived the privilege with respect to all communications between Velsicol and this outside counsel by testifying before the 1976 grand jury. 561 F.2d at 675–676. To avoid the applicability of that judgment with respect to the new subpoenas served upon Ackerly and O'Connor, appellants assert that Mitchell would not have waived the attorney-client privilege if he had been aware of Kennedy's misconduct before the grand jury. Appellants state in particular that he would not have waived the privilege had he known that Kennedy had a conflict of interest stemming from his work with the EPA. Judge Parsons rejected Velsicol's argument on the ground that "the evidence is insufficient to establish that the government extracted a waiver of the privilege from Velsicol by using deceit, fraud or any other wrongful means" (App. 14a).

Velsicol's stance here is particularly ironic since in the prior appeal it contended that there had been no waiver of the attorney-client privilege because "the disclosures made by Mitchell were inadvertent." 561 F.2d at 675. Even apart from this fact, however, we are no more able than the district court to credit the self-serving statements in Mitchell's November 1979 af-

fidavit that his disclosures before the 1976 grand jury were made intentionally in reliance upon representations of good faith made by the former prosecutors and that he would not have testified if he had known of Kennedy's bias resulting from the latter's continuing involvement with the EPA administrative proceedings. The present affidavit is a transparent afterthought patterned on the *Gold* opinion. As such it proves too much. Clearly no one would have been inclined to testify before the original grand jury knowing beforehand that a biased prosecutor would be presenting the evidence and manipulating the grand jury's conclusions. But the fact that hindsight discloses that evidence was subject to misuse does not mean that every disclosure made before the grand jury was procured by fraud. Specific acts of prosecutorial misconduct such as those involved here do not require the wholesale suppression of testimony given in reliance upon the good faith of the prosecutors. Counsel has of course been unable to cite any cases holding otherwise.

██ Viewed from this perspective, appellants' affidavits appear to be no more than a roundabout effort to find the very taint in this specific evidence we have otherwise refused to find in the evidence as a whole. Since the conclusion that the evidence as a whole is not tainted applies equally well here and there is no more reason to apply the exclusionary rule in this specific context than there is in the context of the evidence as a whole, appellants can sustain their objections to the testimony only if they can show some direct causal link between Kennedy's misconduct and Mitchell's specific testimony. This they have failed to do. The record in fact supports the conclusion that the circumstances surrounding Mitchell's testimony were fair. Since Mitchell, an attorney himself, had been advised before his grand jury appearance that he was a subject of a criminal inquiry, he certainly could not have been under a misapprehension that his testimony could not be used against him and Velsicol generally. Further, his testimony was given after consulting one of Velsicol's present outside counsel.

By the time of Mitchell's testimony, moreover, Kennedy was no longer involved in the administrative proceedings. Nor have we seen any part of the testimony of Mitchell that might be said to have been induced by Kennedy's prior conflict or other misconduct. We therefore conclude that Mitchell's prior waiver of Velsicol's attorney-client privilege is still effective in accordance with the general rule. See 8 Wigmore on Evidence (McNaughton rev. 1961) § 2328 at 638–639.

Orders affirmed, our mandate to issue forthwith.