In the Matter of Michael **FELDBERG,** a witness before the Special May 1987 Grand Jury.

Appeal of Norby **WALTERS** and World Sports and Entertainment, Inc., Intervenors.

No. 88–2503.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1988.

Decided Nov. 8, 1988.

Elliot Silverman, Gold & Wachtel, New York City, for appellant.

Howard M. Pearl, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for appellee.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

A grand jury investigating agents who signed amateur athletes to undisclosed contracts issued a subpoena to World Sports and Entertainment in March 1987. The subpoena called for all contracts between World Sports and college football players. World Sports, as a corporation, had no privilege to resist disclosure. See *Braswell v. United States*, — U.S. —, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). Norby Walters, the president of World Sports, engaged Michael Feldberg, a partner of Shea & Gould, to represent both of them. Feldberg came into possession of 51 contracts (just how is the principal issue today) and turned them over to the grand jury on behalf of World Sports. All of these contracts were dated after the expiration of the athletes' collegiate eligibility. The grand jury was not satisfied; after it made a further request, Feldberg produced another seven contracts. Six of these pertained to athletes who held themselves out as eligible to participate in the fall 1987 college football season. The contracts had been post-dated to make it appear that they had been signed after the players' college careers ended; the disclosures revealed that World Sports made a practice of surreptitiously contracting with "amateur" athletes. Such contracts terminated the players' amateur status and made them ineligible to compete; the contracts also exposed the players' colleges to the risk that contests in which they participated would be forfeited. The post-dating came to light only because these contracts had been produced in advance of the date they bore. After receiving the post-dated contracts, the grand jury indicted World Sports and Walters for mail fraud. One of the players involved, Cris Carter (now a wide receiver with the Philadelphia Eagles), has pleaded guilty to mail fraud and obstruction of justice. Sports Illustrated 113 (Sept. 26, 1988).

I

The grand jury wants to know why it did not receive the second set of contracts in response to the subpoena. The prosecutor

believes that there may have been obstruction of justice. Although the United States Attorney does not suspect Feldberg of wrongdoing, the grand jury summoned him to testify about how he obtained the initial batch of contracts. Feldberg is the obvious source of information, because Walters, if summoned, doubtless would invoke his privilege against self-incrimination. *Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957).

The subpoena put Feldberg in an uncomfortable position, because he had served World Sports in two capacities. He was on the one hand its agent, a delivery boy in connection with the documents; he was simultaneously the firm's attorney and undoubtedly had supplied legal advice to Walters and World Sports with respect to their obligations under the March 1987 subpoena. File clerks may be required to testify about their search for documents, but lawyers ordinarily may not be required to testify about facts they learned in confidence in the course of rendering legal advice.

Feldberg answered many questions but asserted the attorney-client privilege in response to the ones of greatest interest to the grand jury—such as who searched the files, and how. The prosecutor asked the district court to compel Feldberg to answer. Walters and World Sports intervened to protect their interests. The district court instructed Feldberg to answer; Walters and World Sports immediately filed this appeal.

The parties disagree about the application of the privilege to eight questions.

1. Q. Did you conduct a search of the files for purposes of gathering the information responsive to this subpoena? A. No. Q. Did you direct someone else to do so? A. [Invocation of privilege.]

2. Q. This [list of 51 names] was to your understanding a ... complete list of the players who were under contract to either Walters or World Sports & Entertainment, Inc.? A.... [T]hat is correct. Q. How did you come to that understanding? A. [Invocation of privilege.]

3. [After Walters received the subpoena, he talked for 15 minutes with Feldberg.] Q. And to the best of your recollection, what was said? A. [Invocation of privilege.]

4. Q. Prior to contacting the U.S. Attorney's Office [and offering to supply the contracts in response to the subpoena], you said that you represented World Sports Entertainment and would handle compliance with subpoena that had been served. Did you have a conversation with anyone affiliated with World Sports Entertainment in which you told them that you were going to do that? A. [Invocation of privilege.]

5. Q. [I]t would be your intention to, at the instructions of your clients, not to answer any questions regarding conversations pertaining to the 51, or the contracts pertaining to the 51 athletes were produced on April 6, 1987, is that right? A. Those are my instructions from my former clients. [Shea & Gould ceased representing Walters and World Sports after mid-1987, which is not important for current purposes.]

6. Q. Did you tell [Walters and an associate] that you were going to convey these contracts to the Government, with the representation that they were all contracts called for by the subpoena? A. [Invocation of privilege.]

7. Q. [D]id you direct anyone to produce such a list [of contracts] for disclosure to the Government? A. [Invocation of privilege.]

8. Q. Did you have a conversation in which you asked someone to give those [51 contracts] to you for disclosure to the Government? A. [Invocation of privilege.]

The prosecutor made two arguments in the district court: first, that there was good reason to believe (a *"prima facie* case") that Walters or World Sports had committed a crime during the course of the legal representation, making the attorney-client privilege inapplicable (the "crime/fraud ex-

ception" to the privilege); second, that because Feldberg gathered the documents in order to turn them over, neither lawyer nor client could have had a reasonable expectation that their discussions would remain confidential.

The district court summarily rejected the first argument, stating without explanation that "no *prima facie* case of fraud or obstruction of justice has been made out". The court did not discuss the second argument. It ordered Feldberg to answer all of the questions on the basis of an argument the prosecutor had not made: that there is a distinction "between communications relating to the act of production on one hand and communications relating to the general subject matter of the grand jury investigation on the other. The pending questions which Feldberg has refused to answer appear to be of the former type, and they should be answered." In this court the prosecutor not only reasserts the two arguments that did not persuade the district court but also defends the ground that court advanced for its decision.

## II

We start with the question whether there is reason to believe that a crime occurred. At the time the district court ruled, the grand jury had not decided whether to indict Walters and World Sports for substantive offenses. Learning how the search had been conducted might have helped the grand jury decide whether to continue its investigation in the hope that there might be more documents where the second set came from. After the district judge's decision, the grand jury returned an indictment. The prosecutor is not entitled to use the grand jury after the return of an indictment to obtain discovery in the criminal case. So unless there is some prospect of demonstrating obstruction of justice, there is no need for Feldberg's testimony, and the case is moot.

Although the district judge gave the back of his hand to the prosecutor's suggestion of fraud or obstruction of justice, it is not so easy to dismiss the possibility. World Sports was a small outfit. Although Walters had some aides, he held the firm's principal documents. Walters apparently kept the contracts in his office. Disclosing 51 innocent-seeming contracts, while retaining six highly suspicious ones, is not a common result of random errors, and the compact nature of World Sports' files makes it doubtful that one box was overlooked during a trudge through a mile-long warehouse. Cf. *In re Grand Jury Subpoenas*, 773 F.2d 204, 206–07 (8th Cir.1985) (omission of two out of 800 relevant documents does not raise suspicion of obstruction of justice). The missing documents reflected the active business of the corporation, so it should have turned to them first (and probably had them ready to hand). The subpoena unquestionably called for these contracts; a misunderstanding (or mistaken legal advice), though conceivable, is not likely. There may of course be an innocent explanation for the problem. Perhaps the folder of current contracts had been misplaced; perhaps a messenger mislaid them. We need not try to figure out whether an innocent explanation is more likely than a culpable one. "To drive the privilege away, there must be 'something to give colour to the charge;' there must be '*prima facie* evidence that it has some foundation in fact.' When that evidence is supplied, the seal of secrecy is broken." *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (citations omitted). The charge of obstruction has a foundation in fact; the circumstances give color to the charge.

The language *"prima facie* evidence" has suggested to some courts enough to support a verdict in favor of the person making the claim. E.g., *In re International Systems & Controls Corp.*, 693 F.2d 1235, 1242 (5th Cir.1982); *In re Sealed Case*, 676 F.2d 793, 814–15 & n. 88 (D.C. Cir.1982). We are not among them, see *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49 (7th Cir.1980), nor are most of the other courts of appeals, e.g., *In re Grand Jury Subpoena*, 731 F.2d 1032, 1039 (2d Cir.1984); *In re Antitrust Grand Jury (Advance Publications, Inc.)*, 805 F.2d 155, 165–66 (6th Cir.1986). The ques-

tion here is not whether the evidence supports a verdict but whether it calls for inquiry. Courts often use *"prima facie evidence"* to refer to enough to require explanation rather than evidence that by itself satisfies a more-likely-than-not standard. One need only think of litigation about claims of racial or age discrimination, in which most of those who satisfy the lax standards of a *prima facie* case go on to lose on the merits. Here, as in the law of discrimination, a *prima facie* case must be defined with regard to its function: to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation. See *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981); *Washington v. Electrical Joint Apprenticeship Committee,* 845 F.2d 710, 14 (7th Cir.1988). If the court finds the explanation satisfactory, the privilege remains. As the Advisory Committee on Rules of Evidence wrote in explanation of the crime/fraud exception to the privilege proposed in Fed.R.Evid. 503(d)(1) as promulgated by the Supreme Court in 1972:

> The privilege does not extend to advice in aid of future wrongdoing. 8 Wigmore § 2298 (McNaughton Rev.1961).... No preliminary finding that sufficient evidence aside from the communication has been introduced to warrant a finding that the services were sought to enable the commission of a wrong is required. While any general exploration of what transpired between attorney and client would, of course, be inappropriate, it is wholly feasible, either at the discovery stage or during trial, so to focus the inquiry by specific questions as to avoid any broad inquiry into attorney-client communications. Numerous cases reflect this approach.

56 F.R.D. 183, 239–40 (citations omitted). Congress disapproved the Supreme Court's proposed Rule 503, largely on the ground that matters of privilege should be left to state law in diversity cases and common law in federal cases. This comment captures well the common law of the crime/fraud exception to the privilege, however, and under its approach the prosecutor has raised questions sufficient to call for a careful inquiry in the district court. (The evidence here is independent of the communications, and we therefore need not address the question whether the communications may themselves undercut the privilege, a question that has divided the courts of appeals. See the cases collected in *United States v. Zolin,* 842 F.2d 1135, 1137 (9th Cir.1988) (order dismissing en banc proceeding) (Beezer, J., dissenting), cert. granted on other grounds, —— U.S. ——, 109 S.Ct. 257, 102 L.Ed.2d 246 (1988.) There has so far been no inquiry at all. The district court's decision whether a *prima facie* case has been made out may be disturbed only if the court abused its discretion, see *September 1978 Grand Jury (II),* 640 F.2d at 59. The district court's failure to give a reason for its decision, coupled with the logical inferences from the evidence compiled to date, leads to the conclusion that discretion has indeed been abused.

### III

■ Although the prospect of establishing obstruction of justice prevents the case from being moot and provides a potential basis for overcoming a claim of privilege, it does not supply a basis for affirming the decision, because the district court never subjected the prosecutor's claims to the test. The court's order rests on a different ground, a distinction between Feldberg's role as substitute for the corporate records custodian and his role as lawyer. Walters and World Sports contend that no such distinction is tenable. To the contrary, a distinction of this kind is essential if the privilege is to be limited to those disclosures related to legal advice. A business that gets marketing advice from a lawyer does not acquire a privilege in the bargain; so too a business that obtains the services of a records custodian from a member of the bar.

The attorney-client privilege has not been codified. But statements of that privilege from every perspective recognize a limita-

tion to legal topics. Wigmore's treatise, which we quoted favorably in *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 319 (7th Cir.1963), says that the privilege applies "[w]here legal advice of any kind is sought from a professional legal adviser in his capacity as such, *the communications relating to that purpose*" (8 Evidence § 2292, internal numbering omitted, emphasis added). The Supreme Court's proposal in 1972, which treated the privilege as an exception to the rule of access and therefore one of limited scope, stated things this way: "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications *made for the purpose of facilitating the rendition of professional legal services to the client*". Proposed Fed.R.Evid. 503(b), 56 F.R.D. at 236 (emphasis added). The American Law Institute's *Restatement of the Law Governing Lawyers* (Tent. Draft No. 1, 1988), which contains perhaps the broadest privilege ever proposed in the United States, has similar language. A communciation is privileged under the ALI's treatment if made for "the purpose of obtaining or providing legal assistance for the client", § 118(4), which the *Restatement* further defines as a communication that "relates to legal advice or other legal assistance that a lawyer is to render to a client", § 122(1). The comment adds: "the person consulted must be functioning in the professional capacity of a lawyer".

Most corporate records custodians are not lawyers. Answers to questions such as "where did you look for the documents?" will not reveal legal advice; recognizing the grand jury's right to ask such questions will not dissuade persons from obtaining legal advice. A grand jury may compel a corporate records custodian to testify about the nature of his search and the adequacy of the disclosure, *In re Grand Jury Proceedings (John Doe Co.)*, 838 F.2d 624, 626 (1st Cir.1988). Such an inquiry may be essential to determine whether the grand jury has received the documents to which it is entitled. If the inquiry itself is legitimate, the addressee of the subpoena cannot put the subject off limits by having

counsel turn over the documents. After all, the attorney-client privilege covers "only those disclosures necessary to obtain informed legal advice." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Since questions about the adequacy of the search do not entail legal advice, the topic is not off limits just because an attorney plays a role.

The privilege is not good in itself. The legal system needs information to decide cases correctly. See *United States v. Nixon*, 418 U.S. 683, 708–13, 94 S.Ct. 3090, 3107–10, 41 L.Ed.2d 1039 (1974). When the privilege shelters important knowledge, accuracy declines. Litigants may use secrecy to cover up machinations, to get around the law instead of complying with it. Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further. Courts protect adverse information in the hands of counsel because counsel needs both favorable and adverse news to devise a strategy. It is not possible to separate adverse from favorable information in advance; a client, knowing this, would find disclosures of all sorts more costly if there were no privilege. See also *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). There is no need for a privilege to cover information exchanged in the course of document searches, which are mostly mechanical yet which entail great risks of dishonest claims of complete compliance. Dropping a cone of silence over the process of searching for documents would do more harm than good. It is easy for a firm such as World Sports to hire an attorney to render advice on all legal matters while hiring a clerk to look through the records. The categories would merge if the clerk should find a questionable document, leading the firm to inquire of the lawyer whether the document fell within the scope of the subpoena (and whether, if it did, it had to be produced). Perhaps some of the conversations in this case were of that character, and if so they are privileged. But a corporation may be required to disclose its books and documents to a grand jury, e.g., *Consolidated Rendering*

*Co. v. Vermont,* 207 U.S. 541, 554, 28 S.Ct. 178, 181, 52 L.Ed. 327 (1908), and may not throw the veil of privilege over the details of how files were searched, and by whom, through the expedient of involving a lawyer in the process. We suppose that a grand jury could refuse to accept documents from the hand of a lawyer, could insist that the corporation's own records custodian or its principal officer, as in *Braswell* and *Brown v. United States,* 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500 (1928), produce them personally. If the grand jury did so, no attorney-client privilege would attach to questions about the mechanics (who, how, when, where) of the search. If we were to recognize a privilege with the scope Walters and World Sports assert, that would simply lead prosecutors to disdain the proffered cooperation of counsel. That would complicate life for both grand jury and target (surely World Sports thought responding through counsel was in its own interests), without affording any confidentiality to the process of the search.

The distinction between the mechanical and advisory portions of Feldberg's role shows that the district court was right to compel answers to several but not all of the questions. Questions 1, 7, and 8 all deal with whether Feldberg, in his role as records custodian, directed someone to search the files; if so, who and how. The answers would not reveal legal advice rendered to the firm or confidential information received from it. Question 6 is similar, asking only whether Feldberg told World Sports that he was about to turn over the documents as the full reply to the subpoena. Question 4 concerns the scope of Feldberg's employment, a topic not privileged unless the extent of the engagement reveals confidential information—doubtful here, given that Feldberg's role in turning over documents is public knowledge. Question 3, however, likely called for some privileged information (assuming the fraud/crime exception is inapplicable). It required Feldberg to disclose the contents of a 15–minute conversation with Walters. This may have been limited to mechanical questions, but the prosecutor who put the

question did not first attempt to identify its scope; the conversation could well have covered privileged subjects too. It was premature to order Feldberg to answer this question.

The remaining questions are not so easy to put in pigeonholes. The exchange we have identified as Question 5 is not a question but a statement of intent to invoke the privilege in response to a category of questions that might be asked. Question 2 (essentially, "how did you know the list of 51 contracts was complete?") calls for information that might be mechanical ("The person who did the search told me these were all he found.") or might be covered by the privilege ("After someone had found a lot of documents, I made a judgment about which were responsive to the subpoena.") or might be some mixture ("I gave legal instructions to the searcher based on a determination about the scope of the subpoena, and the searcher told me that he had found all documents fitting the description I gave him."). The district court could not properly order Feldberg to answer Question 2 without making a preliminary determination—after an *in camera* hearing, if necessary—about the kind of answer that would be forthcoming. And if the court meant to compel answers to every inquiry potentially within the category covered in Question 5, it acted rashly.

## IV

Our analysis implies the need for a remand, so that the district judge may refine his directions about which questions must be answered and explore the crime/fraud exception. The prosecutor submits that further investigation is unnecessary because any disclosures were made to Feldberg for the purpose of relaying the documents to the grand jury. Information imparted to counsel without any expectation of confidentiality is not privileged. *United States v. Weger,* 709 F.2d 1151, 1154 (7th Cir.1983); 8 Wigmore at § 2292 (privilege applies only to communications "made in confidence"); *Restatement* § 118(3). World Sports knew that Feldberg would disclose what he received, so,

the prosecutor concludes, the clients could not have anticipated confidence.

This line of argument confuses expectations about the *documents* with expectations about the *communications*. Rare is the case in which attorney-client conversations do not lead to some public disclosure. The criminal defense lawyer gathers information and formulates strategy in preparation for a trial; since the trial is public, does it follow that the antecedent communications are unprivileged? A lawyer writes a brief to be filed with the court; does it follow that the drafts of the brief are available to the adversary? A corporation prepares and publishes an internal report about "questionable payments" abroad; we know from *Upjohn Co.* that it does not follow that the government has access to the interviews underlying the published report. An accountant prepares worksheets underlying a tax return; we may infer from *United States v. Arthur Young & Co.*, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), that if there were an accountant-client privilege (there isn't) its domain would include these worksheets. None of the prosecutor's arguments suggests that Feldberg, Walters, and World Sports anticipated (or should have anticipated) the disclosure of their conversations.

## V

Two final observations.

■ 1. We have assumed in light of *Curcio* that if Walters or another agent of World Sports committed a crime in the course of responding to the subpoena, the fifth amendment privilege would prevent the grand jury from obtaining the testimony of that person. Walters and World Sports intimate that this privilege carries over to the examination of Feldberg, on the ground that any information privileged in the hands of the client is privileged in the hands of the lawyer. The Supreme Court assumed in *Fisher*, 425 U.S. at 405, 96 S.Ct. at 1578, that if documents would be protected in the client's hands by the privilege against self-incrimination because of their contents, they would not become available merely because temporarily in the lawyer's

hands for the purposes of obtaining legal advice.

The problem here, however, is different: Walters suggests that Feldberg should not be allowed to report to the grand jury incriminating statements Walters actually made to Feldberg, because the grand jury could not require Walters to make the same statements in its presence. The contents of the statements could not be privileged. A stranger who overheard them could be required to state what he knew. Feldberg's testimony would not coerce Walters to incriminate himself in any way, and the privilege deals only with *compulsory* self-incrimination. Recall the *holding* of *Fisher:* that compulsion to reveal documents already in existence does not violate the fifth amendment when the incriminating information (the contents of the documents) was created without compulsion.

What a client voluntarily reveals to a lawyer is not "compulsory self-incrimination." Statements might be protected by the attorney-client privilege, but if they reveal the contemporaneous commission of a crime, that privilege does not apply. To the extent Walters and World Sports maintain that Feldberg has a derivative privilege against self-incrimination, they not only fail on that claim but also plead themselves out of court with respect to the attorney-client privilege by admitting that a crime was afoot.

2. We held in *Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671, 674 (7th Cir. 1977), *In re November 1979 Grand Jury*, 616 F.2d 1021, 1024–25 (7th Cir.1980), and *In re Klein*, 776 F.2d 628, 630–32 (7th Cir.1985), that the employers of an attorney may intervene before the grand jury and appeal from an order compelling the attorney to testify, even though the court has yet to declare the witness in contempt. This holding is the basis of our jurisdiction of this appeal. As we noted in *Klein*, 776 F.2d at 630, two other courts of appeals agree with this conclusion, while three more have held that only an adjudication in contempt permits the witness to appeal. *Klein* adhered to *Velsicol* and *November 1979 Grand Jury* because of principles of

*stare decisis,* while expressing the hope that the Supreme Court soon would resolve the conflict. *Klein* expressed considerable doubt about the wisdom of permitting such appeals, and the case at hand illustrates the problems.

Feldberg appeared twice before the grand jury. Several of the questions to which he interposed a claim of privilege were quite general. The district judge does not preside in the grand jury room, so the court could not require the prosecutor to rephrase each question to make it acceptable. The district judge's eventual order requiring Feldberg to answer was phrased in functional terms—the court wanted Feldberg to answer questions dealing with his role as custodian and messenger, but not questions dealing with his role as lawyer. With or without the modifications we have required, this order would not have produced a smooth third appearance before the grand jury. Suppose we had affirmed in full. Feldberg could once more have made good-faith objections to several of the prosecutor's questions, requiring another round of proceedings in the district court (and here) without getting much closer to an answer. Despite what we have done to clarify the issue, the subject is in an abstract form. Our opinion deals with the legal problem but does not resolve this case. Both questions concerning the crime/fraud exception and disputes concerning the dividing line between custodial and legal roles will require more attention. The district court will enter another, more concrete order compelling testimony. There could be another appeal, followed by another appearance before the grand jury, followed by an adjudication in contempt, followed by another appeal.

Multiple appeals per witness, stretched over a year or more, frustrate the government's ability to investigate and prosecute crimes. They squander the time of appellate courts and create risks of rendering advisory opinions—of "resolving" questions that will turn out not to matter when the showdown comes. All of the reasons that lead courts to be so chary of interlocutory appeals, e.g., *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* — U.S. —,

108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), apply here, with the added consideration that grand jury investigations are supposed to be especially expeditious. See *United States v. Calandra,* 414 U.S. 338, 349–50, 94 S.Ct. 613, 620–21, 38 L.Ed.2d 561 (1974); *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *United States v. Daniels,* 848 F.2d 758 (7th Cir. 1988). Expedition is conspicuously missing here, and the dispute is not going to be resolved any time soon. We have followed *Velsicol, November 1979 Grand Jury,* and *Klein* in taking jurisdiction of this appeal, which does not imply that this is the preferable way to manage appellate review of questions arising in the course of the grand jury's investigations.

The decision of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.