**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel M. DAVIS, Defendant–Appellant.**

**Nos. 92–2822, 92–3153.**

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1993.

Decided Aug. 5, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 12, 1993.

Thomas Scorza (argued), Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Matthew F. Kennelly (argued), Robert M. Stephenson, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for defendant-appellant.

Before CUDAHY and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

A grand jury returned an indictment against Daniel Davis charging him with obstruction of justice in violation of 18 U.S.C. § 1503. Specifically, the indictment alleges that Davis concealed a document during the course of a grand jury investigation. After the grand jury returned the indictment, the government sought and obtained leave from the district court to subpoena, for question-

ing at trial, Matthias Lydon, an attorney who had represented Davis during the portion of the grand jury's investigation that he allegedly obstructed. After the subpoena was served, Davis filed a motion in limine to bar the proposed questioning on the theory that the testimony the government intended to elicit called for the divulgence of privileged information. The district court denied Davis's motion, and he appeals.[1]

The case against Davis is still pending in the district court. These appeals are interlocutory and, therefore, present significant questions as to our jurisdiction. The jurisdiction of the courts of appeals in criminal cases is, for the most part, limited to "final decisions of the district courts of the United States." 28 U.S.C. § 1291. The requirement of finality reflects a strong policy against piecemeal review, a policy particularly important in the context of criminal actions where the delays and disruptions of interlocutory appeals are especially troublesome. In fact, it is well settled that, as a general rule, a defendant in a criminal case may not take an appeal from an order denying a motion to suppress evidence. *See, e.g., DiBella v. United States,* 369 U.S. 121, 131, 82 S.Ct. 654, 660, 7 L.Ed.2d 614 (1962); *United States v. Dorfman,* 690 F.2d 1217, 1222 (7th Cir.1982). Ordinarily, when the validity of a subpoena is at issue, such as here, the final, appealable decision is an order holding the witness whose appearance is compelled in contempt. *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971).[2]

The parties, however, rely on the judicially created exception to the finality rule first articulated in *Perlman v. United States,* 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918), which permits the holder of a privilege to intervene in order to assert the privilege and to appeal from the rejection of the assertion.[3] The Court reasoned that because the person

called to testify may do so rather than be cited for contempt, the rejection of the claim of privilege is final as a practical matter and thus appealable. On the authority of *Perlman,* we have repeatedly held, albeit with some soul-searching, that clients are entitled to appeal as soon as their attorneys are required, in the face of an assertion of attorney-client privilege, to testify or produce documents. *See, e.g., In the Matter of Klein,* 776 F.2d 628 (7th Cir.1985); *In re November 1979 Grand Jury,* 616 F.2d 1021, 1024–25 (7th Cir.1980); *Velsicol Chem. Corp. v. Parsons,* 561 F.2d 671, 674 (7th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978).

The parties have apparently failed to apprehend, however, that *Perlman, Klein* and *Velsicol,* the cases cited to us in their jurisdictional statements, all involved pending grand jury proceedings. Because an indictment has already been returned against Davis, the jurisdictional inquiry that we must undertake here is considerably different. In fact, *DiBella v. United States,* 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962) and *Cogen v. United States,* 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275 (1929) could be read to deny us jurisdiction here, because in those cases the Court refused to apply the *Perlman* exception when the intervening party seeking suppression was a defendant in the underlying criminal case. But neither *DiBella* nor *Cogen* involved assertions of privilege. On the other hand, *United States v. Calandra,* 706 F.2d 225 (7th Cir.1983), our case most similar to the present one, did. *Calandra* was an appeal from a district court's order denying three criminal defendants' motion to suppress. The motion was based on the defendants' assertion that an attorney-client privilege existed that would bar the testimony of lawyers whom the government intended to call at trial. The appeal was taken while the trial was still in progress. We stated that

1. Two appeals have been consolidated in the present case. Number 92–2822 challenges the district court's denial of Davis's initial motion in limine as well as his first motion for reconsideration. Number 92–3153 contests the district court's denial of Davis's objections to certain material the government submitted to supplement the record. The district court construed

these objections as yet another motion for reconsideration.

2. Lydon has not been held in contempt.

3. Davis's motion in limine is such an intervention.

"[i]t is the possibility of disclosure of information which is thought to be confidential that is central to the *Perlman* exception," and reasoned that, since the allegedly confidential information had already been disclosed to government agents, there was no need for immediate appellate review. *Id.* at 228. We thus dismissed the appeal for want of jurisdiction. The record here discloses no substantial breach of the claimed privilege that has already occurred. For this reason alone, we take jurisdiction over these appeals.

Since we will reach the merits, we must more fully set forth the relevant facts. Davis allegedly obstructed a grand jury that was investigating official corruption in the administration of former Cook County Sheriff James O'Grady. Before taking office, O'Grady, along with his undersheriff, James Dvorak, served as an officer of Special Operations Associates, Inc. (SOA), a Chicago security firm. Upon taking office in 1986, O'Grady and Dvorak resigned as officers of SOA but continued to be shareholders in the company. Michael Caccitolo and the appellant, Davis, also owned shares of SOA and served as its corporate officers after O'Grady and Dvorak left for the sheriff's office.

During O'Grady's tenure as sheriff, the Cook County Board of Commissioners, upon the recommendation of O'Grady and Dvorak, awarded Home Incarceration Systems of Northern Illinois, Inc. (HISNI), whose sole shareholder was Audrey Tokarz, a contract to provide and service equipment used as part of the County's home incarceration program. In late 1989, some people, including apparently some in the United States Attorney's office, suspected that HISNI was actually a front for SOA and that O'Grady and Dvorak had impermissibly used their influence to steer the home incarceration contract to HISNI. A grand jury was convened to investigate, and, on January 3, 1990, Davis was served, as president of SOA, with a subpoena demanding the following:

For the period from January 1986 to the present, any and all *ORIGINAL* records

and *ORIGINAL* received correspondence, and copies of any and all outgoing correspondence, involving business and/or financial transactions between Special Operations Associates and any of the following persons or entities: Audrey Tokarz; Home Incarceration Systems....

Government's App. at 5. Shortly after the subpoena was served, Lydon informed the government that he would be representing Davis during the grand jury's investigation.

On January 8, 1990, Lydon met with an assistant United States attorney and an agent of the Federal Bureau of Investigation. He presented a completely innocent explanation of the relationship between SOA and HISNI. He further disclosed that Davis had made a series of personal loans to Tokarz to "start-up" HISNI. The assistant United States attorney responded that the grand jury was interested in Davis's relevant personal records as well as the corporate records of SOA. He indicated that he would serve a "personal records" subpoena on Davis to supplement the first, corporate-records subpoena. This subpoena was issued on January 9, 1989 and commanded Davis to produce "[a]ny and all *ORIGINAL* documents, checks and other records of any kind relating to financial, loan, and/or business transactions between Daniel Davis and any of the following persons or entities: Audrey Tokarz; Home Incarceration Systems of Northern Illinois...." Government's App. at 8.

Caccitolo instructed Betty Ann Wasson, SOA's office manager, to compile the documents demanded by the January 3 subpoena of SOA's corporate records. On January 12, 1990, Lydon transmitted to the government the assembled documents under a cover letter stating that they were "all original documents which respond to the subpoena ... dated December 28, 1989." [4] Government's App. at 10. On January 16 and February 1, Lydon sent to the government documents demanded by the January 9 personal records subpoena. On May 30, 1990, the government learned of the existence of an unexecuted

---

4. The grand jury issued the SOA corporate records subpoena, served on Davis on January 3, 1990, on December 28, 1989.

agreement pursuant to which Tokarz would have been required to sell, upon demand, all of her HISNI shares to Davis and Caccitolo at a pre-arranged, bargain price.[5] The next day, Davis delivered to Lydon for the first time an unsigned copy of this proposed agreement. Lydon informed the government of this document's existence on July 13, 1990, more than five months after Davis ostensibly complied with both subpoenas.

Davis himself then became the target of a grand jury probe. Lydon was subpoenaed to testify before the grand jury. In response to certain questions put to him about his dealings and conversations with Davis regarding Davis's compliance with the subpoenas, Lydon asserted the attorney-client privilege. Davis was nevertheless indicted. The government thereafter informed Lydon of its intention to call him as a witness at Davis's trial. The government also informed Lydon of its position that Davis had waived his attorney-client privilege as to communications with Lydon under the so-called "crime/fraud exception." This prompted Davis to file a motion in limine, the denial of which is the subject of these appeals, seeking to bar the government's proposed questioning of Lydon.

■ The theory of the government's case against Davis is best stated in the indictment returned against him: "Davis ... corruptly endeavored to influence, obstruct and impede the due administration of justice, in that [Davis] concealed and intentionally failed to produce ... in response to the grand juries' subpoenas, a document in the form of an agreement or proposed agreement [between Davis and Tokarz]." Government's App. at 211. The government's theory that certain of Davis's communications with Lydon fall outside the attorney-client privilege rests on the assertion that Davis used Lydon as his agent in perpetrating this obstruction. The district court concluded that the government had established a "prima facie" case that Davis had "trick[ed] [Lydon] into providing false information to a grand jury during an investigation" and that their conversations in

the course of this conduct are "not protected by the attorney-client-privilege." *United States v. Davis*, No. 91 CR 637, slip op. at 15 (N.D.Ill. July 1, 1992) (hereinafter Mem.Op & Ord.). We agree and thus affirm.

Our decision in this regard is governed by *Matter of Feldberg*, 862 F.2d 622 (7th Cir. 1985).[6] In that case, an attorney called before a grand jury invoked his client's attorney-client privilege in response to certain questions. The government contended that the privilege had been waived under the crime/fraud exception, charging that in the course of the legal representation the client had used the attorney to obstruct the grand jury's investigation. *Id.* at 624. We stated that to drive away the privilege under the fraud/crime exception "there must be 'something to give colour to the charge;' there must be 'prima facie evidence that it has some foundation in fact.' When that evidence is supplied, the seal of secrecy is broken." *Id.* at 625 (quoting *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933)). We also noted that "prima facie evidence" did not mean "enough to support a verdict in favor of the person making the claim." *Id.* Instead, we held that a party has established a prima facie case whenever it presents evidence sufficient "to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation." *Id.* at 626. We also stated that if the district court finds such an explanation satisfactory "the privilege remains" and that the district court's decisions regarding these matters may be disturbed only for an abuse of discretion. *Id.*

The linchpin of the district court's conclusion that Davis has waived the attorney-client privilege under the crime/fraud exception is its finding that

the plain language of the [January 3] subpoena indicates that the unexecuted agreement could have fallen within its scope and lends support to the government's charge that the defendant knew that the document was pertinent to the investigation of HISNI and SOA's relationship. There-

---

**5.** Since Davis and Caccitolo were officers and shareholders of SOA, the existence of this proposed agreement was important evidence in the government's continuing investigation of a link between HISNI and SOA.

**6.** We decline Davis's invitation to overrule *Feldberg*.

fore, the existence of the subpoena lends support to the government's charge that the defendant used his attorney-client relationship to conceal this document from the government.

Mem.Op. & Ord. at 10.[7] Davis concedes that these circumstances require an explanation. Along this line, Davis contends that the district court erred because the proposed agreement was not subject to the January 3 subpoena and that if anyone concealed the document it was Caccitolo not he. Davis might be right. To secure a conviction on the crime charged in the indictment, the government will presumably have to prove, beyond a reasonable doubt, that the unexecuted agreement was within the reach of one of the two subpoenas served on Davis and that he intentionally concealed it.[8] But at this stage of the proceedings, the government need not prove its case. All that is needed is something "to give color to the charge" that Davis used Lydon as his agent in obstructing the grand jury's investigation. Whether pale or rich or vivid, there is indubitably color here.

The district court explained that the proposed agreement might be included under the description "original correspondence," Mem.Op. & Ord. at 9, and, if the document was sent to Davis or Caccitolo in their official capacities, this is certainly a plausible conclusion. The district court also noted, quite reasonably we find, that the phrase "original records" could reach "all documents relating to SOA." *Id.* Keeping in mind Davis's and Caccitolo's significant proprietary interests in SOA, as well as their positions as corporate officers, it does not defy reason to conclude that the document in question was somehow related to SOA. Wasson's testimony to the grand jury that she prepared the proposed agreement while working as SOA's office manager further supports this conclusion. Government's App. at 55–57. Davis merely contends that the document could not have been a corporate record of SOA because "the document was kept in a file containing only

Davis' personal records." Appellant's Br. at 27. If this were true, corporate officers could remove any document from the reach of persons investigating the corporation itself merely by putting it in a file marked "personal." We cannot credit an argument that would invite such patent abuse.

Davis also argues that the document in Davis's possession was not an "original" but a copy. The district court, however, concluded that "the word 'original' can also be used to describe more than one copy of a document as long as these copies are made at the same time as the first copy." *United States v. Davis*, No. 91 CR 637, slip op. at 6 (N.D.Ill. July 22, 1992). And Wasson testified to the grand jury that she made three photocopies of the proposed agreement, including the one in Davis's "personal file," at the same time that she prepared the "original." Government's App. at 62. The district court essentially held that an "original" is the document itself and anything else the parties intend to treat as such. Photocopies made contemporaneously with the completion of the "primary" version of the document would readily satisfy this definition. This rationale is consistent with Federal Rule of Evidence 1001(3) and is not an abuse of discretion.

In sum, we conclude that the district court did not abuse its discretion in finding a prima facie case, which Davis did not adequately rebut, that Davis engaged his attorney in fraudulent or criminal activity. We have noted the district court's primary reason for finding that Davis had waived the attorney-client privilege under the crime/fraud exception: Davis apparently represented through his attorney that he had complied with the January 3 subpoena when he knew that he had not. This reason seems adequate, and we conclude that it alone could support the court's denial of Davis's motion seeking to bar Lydon's testimony. We have also reviewed the other justifications that the district court offered in support of its decision. *See* Mem.Op. & Ord. at 10–14. These other

7. The government argues that the same reasoning could be invoked with respect to the January 9 subpoena for Davis's personal records. But the district court made no reference to the second subpoena. Since we are reviewing the district court's decision for an abuse of discretion, we will limit our discussion to matters addressed by the district court.

8. Although the government may also be right that a person can violate 18 U.S.C. § 1503 in a host of ways, Davis is charged here only with concealing and failing to produce a document in response to certain grand jury subpoenas.

points also tend to show that Davis was attempting to conceal the existence of the proposed agreement and was using his attorney for that purpose. They buttress the conclusion that Davis has lost his right to assert the attorney-client privilege.

■ The attorney-client privilege is of crucial importance to our jurisprudence, and its derogation is not to be undertaken lightly. The privilege is waived, however, when the client uses the attorney-client relationship to engage in fraudulent or criminal activity rather than merely to defend against charges. The district court expressly limited the government's inquiry to "asking Lydon whether, during the course of his representation of Davis, Davis admitted lying to him about the existence of the pertinent document and his compliance with the grand jury's subpoena." Mem.Op. & Ord. at 15–16. *Compare Feldberg,* 862 F.2d at 627 (a client's inquiries of his attorney whether a document falls within the scope of a subpoena, and, if so, whether it must be produced, are privileged conversations). With this important restriction, the district court's denial of Davis's motion was well within its discretion.

For the foregoing reasons, the judgment of the district court is AFFIRMED.