In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 05-2573 & 05-2589

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HAYFA KHTHER AL-SHAHIN AND
RIYADH L. AL-SHAHIN,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 567—**John F. Grady**, *Judge.*

_____

ARGUED SEPTEMBER 8, 2006—DECIDED JANUARY 25, 2007

_____

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
MANION, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted Riyadh Al-
Shahin and his wife Hayfa Al-Shahin of mail fraud stem-
ming from their involvement in a scheme to collect money
from an insurance company for a fraudulent automobile
accident. The Al-Shahins appeal, claiming that the dis-
trict court erred in admitting certain testimony at trial, in
refusing to give two jury instructions, and in failing to
conduct an evidentiary hearing regarding extrajudicial
juror communications. They also contest an enhancement

to their sentences for the amount of loss. We affirm their convictions and sentences.

## I.

To combat staged accidents and automobile insurance fraud, the Federal Bureau of Investigation initiated an undercover operation known as "Soft Tissue." The name derives from soft tissue injuries, which are musculoskeletal injuries that do not necessarily present objective symptoms for diagnosis, unlike bruising or broken bones. Since the symptoms consist primarily of a subjective component (such as complaints of pain) they are easier to fake, and hence favored when making fraudulent claims. Operation Soft Tissue investigated fraudulent car accidents in which conspirators staged accidents and then profited by making claims for damage to the cars and inflated medical bills for individuals, including some individuals who may not have even been in the cars during the collision.

In conducting the investigation, the FBI established a law office for agent James Whitmer, a licensed Illinois attorney. With permission from the Attorney Registration and Disciplinary Commission, an agency of the Illinois Supreme Court, Whitmer posed as attorney "James Kent," whose mission was to find and represent clients in settling fraudulent accident claims with various insurance companies. Assisting the investigation and posing as the office manager was cooperating witness David Youhanna. Youhanna had participated in staging accidents for almost a decade and, after a hiatus from his involvement, agreed to cooperate with the government in the investigation. To ensure that the claims processed through the

office were fraudulent, agent Whitmer never advertised, relying instead on Youhanna's recruitment of fraudulent cases and word-of-mouth. Whitmer also insisted on seeing the insurance policy for the at-fault vehicle before the accident occurred for further evidence that the accident was staged.

The incidents surrounding the particular accident at issue began on July 7, 1997, when two organizers of staged accidents (known as "chasers," since they originally chased ambulances to hospitals to recruit claims), Karnick Karamian and Raul Mejia, brought agent Whitmer an American Family Insurance policy belonging to Robert David and proposed to stage an accident on the policy. Those chasers, however, were displaced by a different chaser, Tidy Oshana, who arranged an accident on Robert's policy.

The accident occurred in the late night hours of July 13, 1997 or the early morning hours of July 14, 1997, which was a Sunday to Monday. Notably, the majority of staged accidents occur at this time of the week, because there are fewer potential witnesses and because it is easier to coordinate the participants in the scheme. In this particular accident, Robert, with his father Michael David as a passenger, allegedly missed a stop sign and collided with a vehicle driven by Mrs. Al-Shahin with her husband and daughter as passengers. There were no witnesses to the accident. The Al-Shahins went to the hospital, where they made a police report. Robert, accompanied by his father, made a similar police report at a police station that night.

Michael, Robert's father, later testified at trial that he had been involved in a number of staged accidents. Since he had participated as an at-fault driver in previous staged

accidents, this accident had to be staged in his son's name to avoid raising suspicions with the insurance companies. Michael testified that on the night of the accident, he actually drove his son's car to a restaurant where he gave the keys to Oshana, who in turn gave them to an unknown party. After an hour, the car returned to the restaurant with damage to the front, consistent with a collision from running a stop sign. Robert, the purported driver, also testified at trial that he was never involved in a collision on the night of the accident. Instead, Robert recalled his father returning home that night with the damaged car. His father directed Robert to make a police report and accompanied him to the police station where Robert recited details provided by his father, including the fact that Robert drove the car, missed a stop sign, and collided with the Al-Shahins.

A few days after the accident, Youhanna, the office manager, encountered Tidy Oshana at a medical center where Youhanna had gone to investigate doctors willing to cooperate with fraudulent claims. Oshana stated that he had a case with three individuals, a husband, a wife, and a daughter, that he would be willing to refer to Youhanna and Whitmer. The family wanted money "up-front" and the insurance involved was a policy from American Family. A few days later, Oshana and another chaser, Johnson Bavella, accompanied the Al-Shahins and their daughter to Whitmer's office, the same office where Whitmer had approved, prior to the accident, Robert David's American Family insurance policy on which the Al-Shahins now sought to make a claim. The Al-Shahins then met with Youhanna, signed attorney-client agreements, released their medical records, and executed promissory notes for an advance from the attorney.

Whitmer issued checks to the Al-Shahins, providing them with money up-front for their claims.

Whitmer then pursued settlement of their claims. He obtained their medical records from the emergency room and the clinic where the Al-Shahins received therapy. The Al-Shahins received therapy approximately three or four times each. The Al-Shahins, however, following instructions, signed in on a blank clinic form twenty-one times each. The medical center then billed for substantially more therapy than they each received, but Whitmer negotiated with the center to pay only half of the charges. Whitmer then mailed a demand letter to the insurance company on behalf of the Al-Shahins. The insurance company subsequently mailed settlement checks to Whitmer for the Al-Shahins on June 4, 1998. The checks for personal injuries totaled $17,250. The Al-Shahins signed releases, which Whitmer then mailed back to the insurance company on their behalf on June 16, 1998. A grand jury indicted both Hayfa and Riyadh Al-Shahin for two counts of mail fraud for the mailing of the settlement checks and the releases. 18 U.S.C. §§ 1341-42.

The Al-Shahins pleaded not guilty and, at trial, argued that they were involved in a real accident and that their part of the collision was not staged. Instead, they claimed to have been at the wrong intersection at the wrong time. The jury found otherwise and convicted each on both counts. The day after the verdict, an Assistant United States Attorney who was not involved in the case heard from a fellow commuter, a non-juror, that the jury was having a difficult time reaching a verdict. (A juror who was a mutual acquaintance of the commuter and the AUSA had apparently relayed this information.) After trial, the government managed to identify the trial on which the

juror was empaneled and the particular juror, and disclosed this information. The district judge concluded that there was no need for an evidentiary hearing based on the comments because they were "innocuous."

The judge then sentenced Mr. Al-Shahin to twelve months of imprisonment and Mrs. Al-Shahin to five months of imprisonment and five months of home confinement, and imposed joint and several liability with the Davids (who had pleaded guilty) for restitution of $23,964[1] to the insurance company. The Al-Shahins appeal their convictions and sentences. In particular, they argue that Whitmer's testimony should have been excluded based on their attorney-client privilege, and that the district court should have instructed the jury on the advice-of-counsel and entrapment defenses. The Al-Shahins also argue that the district court abused its discretion in denying a hearing regarding an extrajudicial juror communication. Finally, the Al-Shahins challenge the imposition of a sentencing enhancement for the amount of loss. We address each of these arguments in turn.

## II.

We begin by considering the admissibility of agent Whitmer's testimony. The Al-Shahins filed a motion in

---

[1] This amount is the sum of the Al-Shahins' personal injury settlements ($17,250), the settlement for damage to their car ($3,696), and the settlement the Davids (the occupants of the other vehicle in the accident) obtained from the insurance company ($10,000), less the amount that had already been returned to the insurance company through the attorney fee charged by Whitmer.

limine to bar his testimony based on the attorney-client privilege. The parties do not contest that this situation falls within the ambit of the privilege, unless an exception applies. *See* Fed. R. Evid. 501; *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). The government argues that the crime/fraud exception applies, rendering Whitmer's testimony admissible. Under this exception, the "privilege is [ ] forfeited if the attorney is assisting his client to commit a crime or a fraud." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006) (citation omitted). The district court agreed with the government that the crime/fraud exception to the privilege applied and admitted the testimony. We review the district court's decision to apply the crime/fraud exception for abuse of discretion. *United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993).

In order for the crime/fraud exception "[t]o drive the privilege away, there must be 'something to give colour to the charge;' there must be 'prima facie evidence that it has some foundation in fact.'" *Clark v. United States*, 289 U.S. 1, 15 (1933) (quoting *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.)); *see also Davis*, 1 F.3d at 609; *In re Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988). If such evidence of a crime or fraud exists, then "the seal of secrecy is broken" and the privilege is inapplicable. *Clark*, 289 U.S. at 15 (citations omitted). In this circuit, the standard for prima facie evidence "is not whether the evidence supports a verdict but whether it calls for inquiry." *In re Feldberg*, 862 F.2d at 626. In other words, "[a]ll that is needed is something to give color to the charge" that the Al-Shahins engaged in a fraudulent scheme to obtain money for a staged accident from an insurance company, culminating in mail fraud. *Davis*, 1 F.3d at 610 (internal quotation omitted).

In this case, undercover agent Whitmer saw the at-fault driver's insurance policy before the accident occurred and, after the accident, the Al-Shahins sought his representation to make claims on that policy. The accident occurred on a Sunday to Monday night, the most common time for staged accidents, and the Al-Shahins suffered only soft tissue injuries, which is typical in staged-accident schemes. The purported driver and passenger of the other vehicle involved in the collision admitted that the accident was staged and testified at trial. Additionally, the Al-Shahins' friend, Oshana, who brought them to Whitmer's office, worked as a chaser involved in staging fraudulent accidents. Finally, the Al-Shahins signed in twenty-one times each at the medical center, notably using different colored pens every few lines, even though they received therapy only a few times each. These facts and others provided the district court with sufficient circumstantial evidence that the Al-Shahins were engaged in fraudulent conduct. This established a prima facie case: "[w]hether pale or rich or vivid, there is indubitably color here." *Id.* This evidence "drive[s] the privilege away" and, therefore, the district court did not abuse its discretion in admitting Whitmer's testimony. *Clark*, 289 U.S. at 15.

We next address the district court's denial of jury instructions on the advice-of-counsel and entrapment defenses. We review a district court's "decision not to instruct on a theory of defense de novo." *United States v. Irorere*, 228 F.3d 816, 825 (7th Cir. 2000) (citation omitted). The Al-Shahins rely in their brief on this court's statement that a defendant "in a criminal case is entitled to have the jury consider any theory of defense which is supported by the law and which has some foundation in the evidence, however tenuous." *United States v. Briscoe*,

896 F.2d 1476, 1512 (7th Cir. 1990) (internal quotation and citations omitted). Defendants, however, do not cite the next sentence of *Briscoe*, which reads: "However, the defendant is not necessarily entitled to have his or her particular instruction presented to the jury . . . ; rather the defendant is only entitled to have his or her theory of defense presented to the jury." *Id.* (internal quotation and citations omitted). An instruction on a defendant's theory of defense may only be given to the jury if

> the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial.

*Id.* (internal quotation and citation omitted).

With respect to the advice-of-counsel defense, this theory was not supported by the evidence. The advice-of-counsel defense requires a defendant to establish the following elements:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*United States v. Cheek*, 3 F.3d 1057, 1061 (7th Cir. 1993) (internal quotation and citation omitted). In this case, the Al-Shahins did not receive advice from or even contact Whitmer prior to the accident, although they did solicit

his representation prior to making claims with the insurance company. Even with regard to making claims after the accident, however, there is no indication that the Al-Shahins solicited advice regarding the legality of making claims on a fraudulent accident; rather, the theory at trial was that their portion of the accident was not staged. This is not a situation in which the Al-Shahins relied on the advice of an attorney and proceeded with their conduct. Instead, the Al-Shahins sought representation to further their scheme and facilitate recovery from the insurance. There is simply insufficient evidence to support an advice-of-counsel instruction. Since the advice-of-counsel defense is inapplicable under these circumstances, the district court correctly refused to tender a jury instruction on this defense.

Regarding the entrapment defense, the evidence similarly does not support this theory. To obtain an instruction on the entrapment defense, "a defendant must '[produce] sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crimes charged.' " *United States v. Haddad*, 462 F.3d 783, 789-90 (7th Cir. 2006) (quoting *United States v. Santiago-Godinez*, 12 F.3d 722, 727 (7th Cir. 1993)). Sufficient evidence requires "evidence for each of the two prongs of entrapment: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the crime." *Id.* at 790 (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988)). If "there is sufficient evidence that the defendant was predisposed to commit the crime, however, the entrapment defense is properly rejected without a[n] inquiry into government inducement." *Santiago-Godinez*, 12 F.3d at 728 (citations omitted). We note that the Al-Shahins' theory at trial was that the

accident was not staged. This theory is inconsistent with an entrapment defense, which essentially admits commission of the crime, but claims that the government induced the illegal conduct. Regardless, we find that the Al-Shahins were predisposed to committing the crime.

Predisposition "focuses on determining 'whether the defendant was an "unwary innocent" or instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.' " *Id.* (citing *United States v. Casanova*, 970 F.2d 371, 375 (7th Cir. 1992) (quoting *Mathews*, 485 U.S. at 63)). In assessing predisposition, this court considers factors including:

> (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) (citations omitted).

In this case, although the Al-Shahins do not appear to have previously participated in fraudulent accidents, there is sufficient evidence to indicate that they were predisposed to commit this action. The Al-Shahins performed several acts indicating their predisposition to commit fraud before they had contact with agent Whitmer or cooperating witness Youhanna. Specifically, after the accident occurred, the Al-Shahins sought medical attention at the hospital and the clinic, and they arrived at the purported law office ready to file a claim. Although Youhanna had met with Oshana previously, neither

Youhanna nor Whitmer directly contacted or induced the Al-Shahins to participate in the accident or to seek compensation from the insurance company. Instead, the Al-Shahins affirmatively sought assistance in filing their claims with the insurance company. They also sought and accepted up-front, advanced payments from the attorney. There is no evidence that the Al-Shahins lacked predisposition to engage in fraudulent conduct when they arrived at the purported law office. Although the evidence of their involvement was circumstantial, they were not "unwary innocent[s]." *Santiago-Godinez*, 12 F.3d at 728 (citing *Casanova*, 970 F.2d at 375 (quoting *Mathews*, 485 U.S. at 63)). The jury found that the Al-Shahins participated in a staged accident, but there is no evidence that this accident was organized by the government. Whitmer, a government agent, mailed the documents that gave rise to the mail fraud charges, but he did so in the course of representing the Al-Shahins to recover money from the insurance company. His mailing of the documents was in accordance with the representation the Al-Shahins sought and to which they agreed without reluctance or a need for persuasion. The Al-Shahins did not lack predisposition to commit the crime. Therefore, we need not address government inducement and conclude that the district court properly refused to instruct the jury on the entrapment defense. *Santiago-Godinez*, 12 F.3d at 728.

The next issue is whether a hearing was required regarding an alleged improper extrajudicial juror communication. The Supreme Court has determined that extrajudicial communication with a juror may be presumed to be prejudicial and a defendant may be entitled to a hearing on the communication. *United States v. Remmer*, 347 U.S. 227, 229 (1954). "The presumption is not conclusive, but the

burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.* (citations omitted). In cases that involve "an innocuous comment," however, "no *Remmer* hearing is necessary." *Whitehead v. Cowan*, 263 F.3d 708, 724-25 (7th Cir. 2001) (citing *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir. 1985) (affirming the district court's denial of an evidentiary hearing when "a juror simply overheard an ambiguous and otherwise innocuous comment")). "A district judge has substantial discretion in handling extrajudicial juror communications." *Thibodeaux*, 758 F.2d at 202 (citations omitted). We therefore review the judge's determination not to hold an evidentiary hearing regarding extrajudicial juror communications for an abuse of discretion. In this case, the district court judge denied an evidentiary hearing, concluding based on the government's submission that "no improper conduct occurred and that there was no prejudice to either of the defendants from the incidents described in the Government's disclosure." The district court judge further concluded that the comments were "innocuous," citing *Whitehead*, 263 F.3d at 724-25.

We were initially curious at the district court judge's finding that "no improper conduct occurred," since jurors are routinely instructed not to speak about deliberations or communicate about the trial, and since a juror's communication would then constitute the improper conduct of violating an instruction. In this case, however, a review of the record indicates that the district court judge did not instruct the jury that they should not speak about the trial proceedings with anyone. From the record, it appears that at recesses and at the end of each trial day, the jury was excused without caution or admonition about

their communications and was only told when to return. *Cf.* 1A Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, *Federal Jury Practice and Instructions* §11.01-02 (5th ed. 2000) (suggesting that at each recess the jury be instructed that "[d]uring this recess and all other recesses, you must not discuss this case with anyone. This includes your family, other jurors, and anyone involved in the trial. If anyone attempts in any way to talk to you about this trial during a recess it is your obligation to tell me immediately."). The parties did not request a cautionary instruction at trial. We find this omission unusual. Normally it is preferable to instruct the jury routinely about their communications, but without such instruction, there was nothing for the juror to violate. The district court was therefore correct in concluding that "no improper conduct occurred," insofar as no court instruction was violated. Furthermore, the disclosure provided by the government indicates that the comments were innocuous. There is no indication of jury tampering, bribery, any attempt to influence the jury, or any other improper conduct. *See Whitehead*, 263 F.3d at 726 ("mere speculation concerning prejudice to the defendant is not sufficient to warrant reversal" (citation omitted)). Accordingly, the district court did not abuse its discretion in denying a hearing to address this matter further.

Finally, we reach the Al-Shahins' challenge to the calculation of their sentencing guideline ranges, specifically to the enhancement for the amount of loss. A district court's finding on the amount of loss in calculating the sentencing guideline range is reviewed for clear error. *United States v. Dillard*, 43 F.3d 299, 309 (7th Cir. 1994). In appealing a district court's loss calculation, the defendant must show that the district court's calculation "was

not only inaccurate but outside the realm of permissible computations." *United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000) (internal quotations and citation omitted).

In this case, the district court imposed a six-point enhancement for an amount of loss ranging from "more than $30,000" to $70,000. U.S. Sentencing Guideline Manual § 2B1.1(b)(1)(D) (2003). An application note for this section clarifies that "loss is the greater of actual loss or intended loss." *Id.* § 2B1.1, app. note 3(A). "Intended loss" is further defined as including "intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.* as in . . . an insurance fraud in which the claim exceeded the insured value)." *Id.* at app. note 3(A)(ii). The district court calculated the amount of intended loss by using the claims Whitmer submitted in a demand letter to the insurance company on behalf of the Al-Shahins. The demand was for $52,414, which was three times the amount of actual medical costs. The Al-Shahins argue that Whitmer formulated the demand without their specific knowledge, although they learned of the demand amount later. They ultimately settled for less than their demand, receiving $20,946 from the insurance company for both their injuries and car damage. There is no evidence, however, that they repudiated the demand amount. In fact, Whitmer testified that the Al-Shahins "wanted more money" than they received, and had expected to receive three times the amount of their medical bills. Because the intended loss figure the district court applied was rationally based on the claims submitted, and the Al-Shahins tacitly approved this request, it is within "the realm of permissible computations." *Lopez*, 222 F.3d at 437. Consequently, the district court did not clearly err in calculating the loss.

### III.

Because we conclude that the district court did not abuse its discretion in admitting the testimony of Whitmer, properly denied jury instructions on the advice-of-counsel and entrapment defenses, and did not abuse its discretion in refusing to conduct a hearing on extra-judicial communications or in calculating the amount of loss, we AFFIRM the convictions and sentences of both Hayfa and Riyadh Al-Shahin.

A true Copy:

      Teste:

                     _____

                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*